## Walter Crane v. Edwin Reeder and Eliza Reeder.

*Deed: Execution: Witnesses.* It is essential to the validity of a deed of land in Michigan, executed in 1823, under the law of 1820, that it be attested by two witnesses.

*Rights and disabilities of aliens: Jay's Treaty: Act of Congress of 1807 (chap. 34): Of Michigan of 1805: The Northwest Ordinance.* The provisions of the 9th article of the Treaty with Great Britain of 1794 (*Jay's Treaty, 8 U. S. Statutes, p. 122*), which secured to British subjects the right to grant, sell or devise the estates they held at the date of the treaty, in like manner as if they were natives, apply only to the protection of valid titles; and the provisions of the same article against the effect of the alienage of the heirs or assignees of such grantors will not apply to mere possessory rights without any title in fact, which by a subsequent act of Congress were enlarged into freeholds where there had been continuous occupancy and improvement.

CRANE *v.* REEDER.

The act of the Governor and Judges of Michigan, adopted July 15, 1805, "authorizing any foreigner to take and hold lands," does not confer upon the heirs of such foreigner the right to take such lands by inheritance, unless such right becomes vested before the repeal of the act.

The policy of the United States Government has always been to encourage resident aliens to become citizens. It would be a violation of that policy to concede, by construction, to those who choose to continue aliens, rights not expressly conferred by treaty or by statute; and an act which merely converts an actual possessory right into an estate in fee, or which declares that such estate should descend to the children of resident and non-resident proprietors, will not, of itself, have the effect to remove the disability of the alienage of such children.

*Tenures: Escheats in Michigan: Failure of heirs: Evidence: Office found.* Tenures and their incidents and rules of inheritance are all the creation of law; and, except as to rights already vested, may be changed and modified at pleasure.

Estates in this country, on the failure of heirs, must go where the law directs. During the period while Michigan was governed as Territory the local legislature had power to provide for such cases. The act of the Governor and Judges regulating descents, adopted July 27, 1818, to take effect October 1, 1818 (*R. L. 1820, p. 29,* § *1*), which prescribed that for want of heirs estates should accrue to the Territory, was a valid exercise of such power; and Congress having made no other provision, the act of June 15, 1836, for the admission of Michigan into the Union, ratifying the proposed Constitution of the State, which provides—*Schedule,* § *3*—that all escheats accruing to the Territory shall accrue to the State, establishes the title to all lands, escheated before that time, in the State.

Neither at the common law, nor under the statutes of this State, is any inquest, or other proceeding in the nature of office found, necessary to vest in the sovereignty the title to lands escheating for want of heirs, and the State may sell the land at any time after the escheat without resort to any such proceedings.

To prove a failure of heirs in cases of escheat, it is not necessary to exhaust the possibilities; and in cases where aliens are disqualified, proof of alienage, the American marriage, and death without issue, is enough.

There is no authority for holding that hearsay evidence is admissible to prove the existence of living persons; and still less, that it can be allowed to prove such existence, when it furnishes no means of finding or identifying them.

*Statutes of limitation: Presumption of title.* Statutes of limitation will not operate against the State without express words declaring such to be the purpose of the act.

There can be no presumption of title from ancient grant as against the State in a case where the right of the State accrued prior to March 1, 1847, and is not barred by any statute of limitations; nor will such presumption be allowed to dispute the accuracy of public acts and records, in a case where there is positive and unquestioned evidence that no such title existed, or was ever set up beyond the assumption of possession.

*Entry: Conveyance of lands held adversely.* An actual entry upon lands within this State, in order to maintain an action to recover the title, or the possession of the land, has not been necessary since the act of the Governor and Judges of February 26, 1821 (*Ed. of 1833, p. 386*); and since March 1, 1847 (*Rev. Stat. of 1846, p. 263,* § *71*), lands may be conveyed, notwithstanding they are, at the time, held adversely to the grantor.

*Heard April 26, 27, 28, 29. Decided July 7.*

21 MICH.—D.

Error to Wayne Circuit.

This was an action of ejectment brought by Walter Crane in the Circuit Court for the county of Wayne against Edwin Reeder and Eliza Reeder, devisees under the will of Edwin Reeder, deceased, who devised to them, in common with others, a large tract of land, which includes the *locus in quo.* The facts, as developed on the trial, are substantially as follows:

In 1799, John Harvey was a resident of Detroit. He had come from England several years previously, and had resided in Detroit for several years, pursuing the occupation of a baker. About the year 1816 he removed from Detroit, and in 1819 or 1820 went to Jeffersonville, Indiana, and died there in the year 1825. He had a wife in Detroit, whom he had married in this country, but no children. His wife went to Jeffersonville with him, and died there in 1823. After the death of his wife he sent to England for a daughter, Maria Yorke Harvey, whom he had left there, as he claimed, upon his emigration to this country. She came out, and went to Jeffersonville to reside with him. She was considered his only heir.

In 1801, Harvey acquired the tract, of which the *locus in quo* is a portion, by deed from Todd & McGill. This deed is dated Oct. 31, 1801, and is of record in Wayne county. This tract was confirmed to Harvey by the United States, by patent dated April 20, 1811, and was then, and has been since, known as Private Claim No. 39. On April 27, 1823, Harvey conveyed the tract to Maria Yorke Harvey, by deed executed in the State of Indiana, and acknowledged there before a justice of the peace. This deed had no attesting witnesses. It was recorded in Wayne county in 1826. In 1826, Maria Yorke Harvey intermarried with Edwin Reeder, devisor of defendants in error. She died in 1827, having had no children. Soon after her

death, Reeder visited Detroit, ostensibly for the purpose of looking after the tract in question. In 1831 he took possession of the tract, and resided upon it down to the time of his death, in 1869.

The plaintiff in error relied upon a grant from the State of Michigan, made in 1868. He claimed that the tract in controversy escheated to the Government, either in 1825, on the death of John Harvey, or in 1827, on the death of Maria Yorke (Harvey) Reeder; that, upon the death of John Harvey, he left no heirs except Maria Yorke Harvey; that she was an alien, and could not, under the law, as it existed in 1825, inherit the property. But he also claimed that the deed from John Harvey was invalid for want of witnesses, as required by the law of Michigan in force at the date of the execution of the deed, regulating the execution of conveyances. If the deed was invalid, he claimed that an escheat arose upon the death of John Harvey. But, if the deed was valid, or even if she could inherit, Maria Yorke (Harvey) Reeder was seized of the premises upon her death in 1827, and plaintiff claimed that an escheat then arose because she left no heirs. He claimed, also, that the escheat was either to the United States or the Territory of Michigan, and whether to the one or the other, the State of Michigan succeeded to the title by escheat and could grant the same.

No claim of title was relied on by defendants in error, except that which arose from Edwin Reeder's long possession of the property.

Two questions are presented for review in this Court upon the admissibility of evidence:

1. That the said Circuit Judge erred in admitting in evidence the deed from John Harvey to Maria Yorke Harvey, dated April 27, 1823, offered in evidence on behalf of the defendants: and

2. In permitting Eliza Reeder to testify on behalf of said defendants,—That in the year 1853, while she was living with Edwin Reeder, in his house, said Edwin Reeder had told said Eliza Reeder that his wife, Maria Yorke Reeder, had said to him that the said Maria had two sisters in England who were married and lived in Birmingham.

The plaintiff requested the Court to instruct the jury:

*First,* The deed of the premises in question from John Harvey to Maria Yorke Harvey, executed in 1823, was void for want of witnesses. And if the Court so instructed the jury, the plaintiff requested the further instruction:

*Second,* That the deed being void, it must be assumed upon the evidence that John Harvey died seized of the premises; and if the jury believe that John Harvey, so dying seized, left no heirs surviving him except aliens, the premises escheated on his death. The plaintiff further requested that if the Court should refuse to give the instruction above marked "first," the following instructions should be given:

*Third,* That, assuming the validity of the deed from John Harvey to Maria Yorke Harvey, the evidence tends to show that Maria Yorke Harvey died seized of the premises in the summer of 1827, and, so dying seized, that she left no heirs on her death. If she did die so seized, the question of fact for the consideration of the jury will be whether she left any heirs surviving her.

*Fourth,* If she left such heirs the land descended to them; if not, it escheated to the Government. Edwin Reeder, merely as the husband of Maria Yorke Harvey, would have no title to the premises on her decease.

*Fifth,* The escheat, if an escheat arose either on the death of John Harvey or Maria Yorke Harvey, was either to the United States or to the Territory of Michigan, and whether

to the one or to the other, the State of Michigan, on the organization of the State government, succeeded to the title by escheat.

*Sixth*, That the title by escheat became vested without office found or any other proceeding of that nature.

*Seventh*, That the deed from the State of Michigan to the plaintiff was good and valid to convey the title of the State to him, and he may assert that title in this form of action.

*Eighth*, Conceding all that is admitted or proved in respect to possession by Edwin Reeder or those claiming under him, plaintiff's title is not barred by any statute of limitations.

All of which the Court refused to give, except the third and fourth, and the plaintiff excepted.

The defendants requested the Court to instruct the jury:

*First*, That the plaintiff cannot recover without showing a good legal title in himself, and that any weakness or imperfection in the title of the defendant is not enough.

*Second*, That the patent of the United States granting the premises in question to John Harvey, an Englishman, and to his heirs and assigns forever, created an estate in fee, inheritable by his heirs, even though they were aliens.

*Third*, That the common law doctrine that aliens cannot hold, transmit by descent, or inherit land, did not prevail in the Territory at the time that Maria Yorke Reeder claimed to hold the property in question.

*Fourth*, That the deed made on the 27th of April, 1823, by John Harvey to his daughter Maria, though without two witnesses, was valid and effectual to vest in her and her heirs the title to the premises in question.

*Fifth*, That upon the death of said Maria said title descended to her heirs, if she had any; and if she had

any sisters, or other collateral relatives by blood, then living in England, they were such heirs.

*Sixth,* That since the passage of the statute of March 31, 1827, neither the State nor any one else can dispute or question a title to land by descent, by reason of the alienage of the heirs; and if at her death said Maria left heirs in England, no escheat can be maintained in this case.

*Seventh,* There was no escheat, unless said Maria died without lawful heirs; and if the plaintiff claims that such was the fact, he must establish it by sufficient proof. Failure of heirs is not to be presumed; on the contrary, the legal presumption is that she left heirs, and that presumption must prevail unless the plaintiff can overthrow it by satisfactory proof to the jury.

*Eighth,* That if there was any escheat in this case it was to the United States, the Territorial government not being sovereign, but only a governmental or municipal agency of the United States.

*Ninth,* That the title held by Harvey was an estate of inheritance in fee simple, absolute; and if an escheat occurred, the United States took the premises on the same title, and held said land as proprietors, and not for the purposes of political or governmental use or jurisdiction.

*Tenth,* That such proprietary title did not pass to this State, and this State can neither claim nor grant the same·

*Eleventh,* That in case of escheat, the fact of escheat must be ascertained by the appropriate proceedings on the part of the State before it or its grantee can maintain ejectment for the lands supposed to be escheated.

*Twelfth,* That the act of 1846, under which the trustees have assumed to make the deed to plaintiff, extends only to escheats to the State since its organization.

*Thirteenth,* That the act of 1846 does not authorize such trustees to sell and convey any lands as escheated, of which

neither the State nor the trustees have ever had possession in any way, or which, being held in actual adverse possession, have never been brought under the actual charge or control of the State or of the trustees.

*Fourteenth,* That the continued taxation of these premises, and collection of said taxes from Reeder, during his adverse possession of over thirty-four years, must be considered as a waiver of the escheat by the State.

*Fifteenth,* That under the admitted facts of this case, this action is barred by the statute of limitations.

*Sixteenth,* That the jury, in estimating the sufficiency of the testimony as to the existence of heirs, are at liberty to consider whether any such testimony is positive in its character, and in the line of family tradition, and whether portions of it are purely negative in character, and came from outside of such tradition.

*Seventeenth,* That the act of 1846 authorizes said trustees to take charge of, and sell, only such lands as have escheated to the State for want of heirs.

*Eighteenth,* That the deed of April 18th, 1868, made by the trustees to plaintiff, purports to be a deed made by the State, and is not valid as a deed by the State for want of sufficient execution. It is not valid as a statutory deed of the trustees, because it is not in form their deed.

*Nineteenth,* That even if an escheat occurred as long ago as 1827, as it appears that the premises have been held in uninterrupted and peaceable adverse possession by Reeder since 1831, after the lapse of long time, and the payment and collection of taxes as aforesaid, the jury will be fully warranted in presuming that a grant of lawful title has been made to Reeder.

All were given by the Court as requested, and the plaintiff excepted.

Under the charge of the Court the jury found a verdict

for the defendants, and the judgment entered thereon comes into this Court by writ of error.

*Douglass & Miller, William P. Wells,* and *Geo. E. Hand,* for plaintiff in error.

I. The first question to be considered is the validity of the deed of John Harvey to Maria Yorke Harvey. We insist that this conveyance was void for want of witnesses. *Laws of 1820, p. 156 et seq.; Galpin v. Abbott, 6 Mich., 37, 43 ; Wiswall v. Ross, 4 Port. (Ala.), 324 ; Clark v. Graham, 6 Wheat., 577 ; Parrett v. Shaubhut, 5 Minn., 323-8-30 ; Meighen v. Strong, 6 Minn., 180.* .

II. If the deed from John Harvey to Maria Yorke Harvey is adjudged invalid, it · is necessary to consider, in the next place, whether, if he left no heirs surviving him, except aliens, they could inherit. We maintain that alien heirs could not inherit, under the law of Michigan, as it stood in 1825, the date of John Harvey's death; and if he left no heirs except aliens, the lands escheated.

1. By Article 2d of the Ordinance of 1787, for the government of the territory of the United States northwest of the river Ohio, the common law was recognized as of force in said territory, then including the present State of Michigan. And the common law has been the law of the land in Michigan, except so far as repugnant to or inconsistent with our Constitution and statutes.—*Stout v. Keys, 2 Doug., 188-9 ; Lorman v. Benson, 8 Mich., 25.*

2. No rule of the common law is more fundamental than that alien heirs cannot inherit land.—*2 Kent's Com., 53-4, 61 ; 2 Black. Com., 249 ; 1 Coke (Thomas), 90 ; Orr v. Hodgson, 4 Wheat., 453.*

3. From 8th of May, 1821, to 31st March, 1827, the common law rule as to alien heirs prevailed in Michi-

gan in the absence of any legislative enactment to the contrary, and during this period, in 1825, John Harvey died. The first law enacted in this Territory, permitting aliens to hold and transmit lands, was passed July 15, 1805. —*Woodward Code, p. 16.* This was followed by another act, passed 12th August, 1805.—*Ib. p. 45.* These acts were in force until May 8th, 1821, when a repealing act was passed.—*Laws of 1820, p. 450.* Section 1 of the repealing act repeals the act of 15th July above mentioned, by its title. Section 2 repeals the act of 12th of August under a general clause of repeal. So that there was no law of this kind in force in 1825, when Harvey died.

4. It may be urged that, although no statute was in force in 1825 permitting aliens to inherit, the proviso in the repealing act preserves all rights acquired under the repealed statutes, and that, therefore, alien heirs of John Harvey could inherit. To this we reply : (*a.*) The lands were not acquired by Harvey under the act of 1805, but in 1801. (*b.*) If acquired under the act, the proviso in the repealing act could not give alien heirs capacity to take. We concede that lands acquired after the act of 15th July, 1805, took effect, would descend to alien heirs while it was in force. The terms of the act are very broad. But not under the act of 12th August, 1805. This, act, however, was void, because not adopted from the laws of one of the original States. Harvey acquired no vested right to transmit, and while he lived there were no heirs who could have any interests, vested or otherwise. *Nemo est hæres viventis.*—*Butler v. Palmer, 1 Hill, 335.* And even entails may be cut down by repeal of statutes.—*Den v. Dubois, 16 N. J., 285.*

5. Another act, similar to the acts of 1805, was passed March 31, 1827, and was, in effect, a re-enactment. The benefit of this act is claimed by defendants in error, under

charge *sixth.* (*a.*) If it is insisted that by some kind of retrospective action this enactment confirmed a title in Maria Yorke Harvey, it is sufficient to reply that Harvey, having died in 1825, while no law permitting aliens to inherit was in force, the estate escheated at once upon his death, because it could not be in abeyance. This act could have no more force, to give her capacity to take, *ex post facto*, than subsequent naturalization. When an estate is cast by descent, subsequent naturalization does not give title, although it does when the estate is taken by purchase. —*The People v. Conklin, 2 Hill, 67.* (*b.*) Nor does the provision of section 2 of this act, that title shall not be questioned by reason of the alienage of any person through whom it is claimed, apply in this case. Here no title is claimed *through* Maria Yorke Harvey. The defendants in error are not defending under a title, one link of which is defective on the ground of alienage. That was the defect which this section was designed to cure. Reeder did not, nor do the defendants, claim *through* or *from* anybody. Their title is only possessory.

6. The patent from the United States confirming the lands to John Harvey and his heirs had no power to enable aliens to inherit lands while the common law rule excluding aliens prevailed. Under the rule that no one is heir to a living person, until the death of John Harvey, in 1825, no one was heir to him; and when he died, the common law, excluding aliens from inheriting, was the law of Michigan. The word "heirs," in the patent, must be construed to mean such heirs as could inherit by the laws of the *locus in quo.*

III. The next inquiry is, to whom the escheat accrued, if there was an escheat in this case.

The evidence tended to show that Maria Yorke (Harvey) Reeder died without heirs, in 1827, and the plaintiff

in error insisted that even if the deed from John Harvey to her was held valid, there was an escheat upon her death in 1827. If the deed was invalid, then the escheat arose on the death of John Harvey in 1825. But whether the escheat accrued in 1825, or 1827, we insist that it accrued to the Territory of Michigan. The Court charged the jury, in the *eighth* charge given in favor of the defendants, that the escheat was to the United States.

Escheat is one of the several different ways in which title to land may be acquired, mentioned and classified by common law writers. The title to land accrued in this way for two causes [1] lack of inheritable blood [*propter defectum sanguinis*], and [2] as penalty of crime of the landholder [*propter delictum tenentis*].—*3 Comyn's Dig., 596; Cruise Dig., 437; Crabbe's Eng. Law, 79.* For lack of heritable blood, under the complicated system of land tenures prevailing in England, partly feudal and partly not feudal, escheats might accrue to the crown or to private persons. But in the absence of any other person entitled thereto, it always accrued to the king as the ultimate heir [*ultima hæres*].

In the United States the State governments have this undoubted prerogative of title by escheat, to all lands of persons who die seized, leaving no heirs by law entitled and competent to inherit the same.—*4 Kent's Com., 424 et seq.*

At the date of the patent of the United States to John Harvey, as well as at the date of `the death both of John Harvey and Maria Yorke (Harvey) Reeder, the government in what is now the State of Michigan was Territorial. This Territorial government enacted certain laws in respect to escheats.

The first was the act of the Governor and Judges, of July 27, 1818, section 1 of which provided (after prescribing

the descent of intestate estates) that "for want of heirs the estate shall accrue to the Territory."—*Laws of 1820, p. 29.* This provision was re-enacted *verbatim* by the Governor and Legislative Council, April 12, 1827.—*Laws of 1827, p. 64.* Under one or the other of these enactments the escheat in this case accrued, if there was an escheat. As the terms of the enactments are explicit, the only question which can be made is as to their validity. This involves an inquiry into the extent and validity of Territorial legislation in 1818 and 1827.

A. *As to act of July 27, 1818.* In 1783, the State of Virginia was proprietor of the *locus in quo,* and by deed of March 1, 1784, conveyed the same to the United States upon certain trusts.—*1 Land Laws, 585–8.*

This was followed by the celebrated Ordinance of 1787, for the government of the territory northwest of the river Ohio.

By this Ordinance a rule of descents was prescribed which was to remain in force "until altered by the Legislature of the District."—*Laws of 1827, p. 23.* The Ordinance also provided that the Governor and Judges should adopt and publish such laws as should be necessary and suited to the circumstances of the District, which laws were to be in force "until the organization of the General Assembly therein, unless disapproved of by Congress; but afterwards the Legislature shall have authority to alter them as they shall think fit."—*Laws of 1827, p. 24.* By Art. IV. of the Ordinance, it was provided that the Legislatures of the Districts, or new States, "shall never interfere with the primary disposal of the soil by the United States," and that * * "No tax shall be imposed on lands the property of the United States."—*Laws of 1827, p. 27–8.*

It appears from these provisions that the only restrictions upon the legislative power of the Governor and

Judges, contained in the Ordinance, as to lands, were: that they must adopt laws from the original States, and that these laws were subject to the disapproval of Congress; and the Legislature were restricted only as to lands of the United States.

By an act of January 11, 1805 (*Laws of 1827, p. 31*), the Territory of Michigan was organized expressly on the basis of the Ordinance of 1787, and so continued (except as to Delegate in Congress), until the Act of March 3, 1823.—*Laws of 1827, p. 35.* This act of January 11, 1805, in section 2, not only provided that in the Territory of Michigan there should be established a government in all respects similar to that provided for the Northwest Territory, by the Ordinance of 1787, but also adds, for fuller assurance, that "the inhabitants thereof shall be entitled to enjoy all and singular, the rights, privileges, and advantages granted and secured to the people of the territory of the United States northwest of the river Ohio by the said Ordinance." It was, as we claim, under the broad and (except as above stated) unrestricted powers of the Governor and Judges under the Ordinance of 1787, that this Law of July 27, 1818, providing that escheats should be to the Territory, was enacted.

The conclusions in respect to its validity are as follows: (1.) It was adopted and published by the Governor and Judges. (2.) It was adopted from Massachusetts, one of the original States. (3.) It was never disapproved by Congress. (4.) The legislative powers conferred on the Governor and Judges by the Ordinance are fully confirmed by the act of Congress of January 11, 1805. (5.) The Ordinance so confirmed by said act of Congress declares that laws enacted as this was "shall be in force in the District" (*i. e.*, Territory).

B. *As to act of April 12, 1827.* The act of March 3,

1823, for the government of the Territory of Michigan (*Laws of 1827, p. 35*), provided for a Legislative Council, and bestowed on it all the powers of the General Assembly under the Ordinance, but no act was to be valid after disapproval of the same by Congress. The powers of the General Assembly, under the Ordinance, were (*p. 25*) "to make laws in all cases for the good government of the district, not repugnant to the principles and articles in this Ordinance established and declared." The assent of the Governor was requisite to their validity. There was no restriction on the legislative power of the Governor and Legislative Council, except that mentioned above, that laws were not to be valid after disapproval by Congress, and this was not in the Ordinance, but enacted in the law of 1823.

It appears, therefore, that the act of April 12, 1827, providing that escheats should be to the Territory, was authorized by Congress, and within the legislative powers of the Governor and Legislative Council.

C. *General considerations as to both acts.* That the Territorial Legislature was authorized to make enactments in respect to escheats, seems apparent when we consider that these enactments related to the subject of land tenures, a matter peculiarly local in its character. This making escheats accrue to the Territory and not to the sovereign power was not a new thing. As early as 1646, in the Province of Massachusetts, and 1650, in Connecticut, there were similar provisions. In New Hampshire, escheats accrued to the towns for the use of primary schools.—*Stat. of Conn., 261; Stat. of N. H., 292.* After the primary disposal of the soil by the United States, the sovereign power, the trust confided to the United States by Virginia, in respect to all lands in this Territory, was exhausted, and thenceforth the United States had no interest in the proprietorship of

·these lands, and the local Legislature had full and ample power to legislate in respect to all the features and incidents of land titles, heirship and escheats included. In respect to the land in controversy the power of the United States over the primary disposal was exhausted by the confirmation and grant by patent to John Harvey.

But the unlimited power of the local Legislature over lands has been asserted by judicial authority. The act of the Governor and Judges of April 2, 1821 (*Laws of 1827, p. 261*), which assumed to exercise one of the highest and most questionable acts of legislative power—that of abolishing entails—was held valid by this Court in *Fraser v. Chene, 2 Mich., 92*. See also *Swan v. Williams, 2 Mich., 430; Mercer v. Williams, Walk. Ch., 86; Bank of Michigan v. Williams, 5 Wend., 478; 7 Wend., 539*.

As we have seen, the terms of both the acts in question are explicit. The language is the same in both, that "for want of heirs the estate shall accrue to the Territory." If their validity is upheld, one or the other of these acts ·governed the escheat in this case, whether it arose on the death of John Harvey or Maria Yorke Reeder. In the former case it arose in 1825, and was governed by the law of July 27, 1818; in the latter it arose in 1827, and was governed by the law of April 12, 1827.

IV. The next question to be considered is whether the State of Michigan succeeded to the title by escheat, if there was any escheat in this case. Our position is, that whether the escheat accrued to the United States or the Territory, the State of Michigan, upon the organization of the State government, succeeded to the title by escheat.

No argument need be made that if the escheat accrued to the Territory, the title passed to the State, upon its admission into the Union as a sovereign State.

But if the charge of the Court is upheld, that the

escheat was to the United States, we still insist that upon the admission of Michigan into the Union, the escheat passed, as an incident of sovereignty, and accrued to and vested in the State.

1.   Whatever title or interest the United States had in the premises in controversy they acquired exclusively from the State of Virginia through the deed of cession of March 1, 1784.—*1 Land Laws, 585.*

2.   The United States accepted the lands ceded by Virginia,—of which the premises in controversy are a portion,—upon and subject to the trusts expressed and stipulated for in the deed of cession, and not otherwise. One of these conditions was that the Territory thus ceded should be laid out and formed into States, " and that the States so formed shall be distinct republican States, and admitted members of the Federal Union, having the same rights of sovereignty, freedom, and independence as the other States." —*1 Land Laws, 586.*

3.   Under this deed of cession, sovereignty and all its incidents, which had previously existed in the State of Virginia, was transferred to the United States, in trust, and for certain temporary purposes, and to be determined and ended as to the territory within a State when such State should be admitted into the Federal Union.—*Pollard's Lessee v. Hagan, 3 How. S. C., 212.*

4.   In case the escheat of the premises in controversy was to the United States as an incident of sovereignty, it vested in the United States only in trust and for temporary purposes, and passed, with all other incidents of municipal sovereignty, to the State of Michigan, when she was organized and admitted into the Federal Union as a sovereign and independent State.—*Pollard's Lessee v. Hagan, 3 How. S. C., 212.*

5.   The position taken in the *ninth* charge for defend-

CRANE v. REEDER.

ants in error, that if an escheat occurred, the United States took the premises in fee simple absolute, and held said land as proprietors, and not for purposes of political or governmental use or jurisdiction, is untenable.

If the land escheated on the death of John Harvey, by reason of the alienage of his heirs, then, undoubtedly, both the title and possession vested at once in the United States, but even then only temporarily and in trust for the State of Michigan to be formed. But if the escheat accrued on the death of Mrs. Reeder, for want of heirs, the United States never held the lands, but only became entitled to assert their right under the escheat. But in neither case could the United States have held the lands absolutely, as if purchased by the United States.—*Pollard's Lessee v. Hagan, ubi sup.*

6. Even under the feudal tenures of England, an escheat, though closely analagous to, was never identical with, a reversion.—*3 Cruise's Dig., 408–9.*

But the modern doctrine of escheat is radically different from the principle of a reversion. It is a legislative declaration as to who shall take the title of the land, upon the happening of the contingency of a lack of heirs, or of heirs incompetent to take, for reasons of public policy and good order.

V. It is claimed that in the case of escheat, for want of heirs, no title vests in the State until the fact that there are no heirs is judicially determined by "office found," or some other proceeding of like nature, and that until the title so vests, the State cannot make a valid conveyance of the land; and hence, that the deed of the State to Crane conveyed no title which will enable him to maintain eject-ment, and the Court below so ruled, in effect. We insist that the contrary doctrine is fully sustained by the author-ities: *Montgomery v. Dorion, 7 N. H., 475 ; O'Hanlin v.*

21 MICH.—F.

*Den, 20 N. J., 31–36 ; Den v. O'Hanlin, 21 N. J., 582 ; Colgan v. McKeon, 24 N. J., 567 ; McCaughal v. Ryan, 27 Barb., 376 ; 4 Kent's Com., 424; Rubeck v. Gardner, 7 Watts, 455 ; White v. White, 2 Metc. (Ky.), 185–192 ; Holliman v. Peebles, 1 Tex., 673 (10 Dig., 191) ; Farrar v. Dean, 24 Mis., 16 ; Hinkle v. Shadden, 2 Swan (Tenn.), 46.*

Without here criticising, in detail, the authorities which will be principally relied upon by the defendants, *viz: Doe v. Redfern, 12 East ; Fairfax v. Hunter's lessee, 7 Cranch, 603 ; Jackson v. Adams, 7 Wend., 367 ; and Wilbur v. Tobey, 16 Pick., 177,* we remark:

1. In England, Virginia, New York, and Massachusetts, the rule of the common law prevails, that no person can make a valid conveyance of lands of which he has not possession either in law or in fact; or, in other words, that a deed of lands in the adverse possession of another is void. The doctrine these cases tend to establish is in harmony with this rule of the common law, and may be considered as forming part of it. It is, substantially, the application to conveyances by the State or sovereign, of the same rule which is applied to the conveyances of private persons. In this State all traces of this ancient rule of the common law have long ago been swept away, and an individual may convey whatever interests he has or claims to have in real estate, whether the same is in his possession or not. And when this is the case, there is no valid cause for holding that the State may not do likewise.

2. The decision in *Doe v. Redfern* is based solely upon the statutes of Henry VI., which are not in force here, because not in harmony with our jurisprudence or institutions. Again, the case concedes that the king may, without office found, convey lands escheated which appear, of record, to be holden immediately of the crown, because in that case it appears, with certainty, that the escheat is to

CRANE *v.* REEDER.

the king, and not to some intermediate lord. Here there can be no uncertainty of this kind, for all escheats are to the State.

The American cases cited by defendants are all based upon statutes which imply that the State cannot convey until office found, and provide for a remedy of this nature.

No statute containing any such implication was ever enacted in this State. The only statute ever in force, either in the State or Territory, providing any remedy of this kind, was *Chap. 9, Pt. 3, Title 3, of Rev. Stat. of 1838*, and this was repealed by the revision of 1846, and has never since been re-enacted. *Rev. Stat. of 1846, p. 593, § 2* (*Comp. Laws 1395, § 27*), provides for information by the Attorney General in case of forfeiture; but an escheat is not a forfeiture, in any sense of the word.

The only remedy known to our law, which could be used as a substitute for office found, is ejectment. But ejectment is a proceeding *inter partes*, and can only be maintained against some person in possession, or who claims title.—*Comp. Laws, § 4557.* Hence, in the case of escheat for want of heirs, the right of the State can never be judicially determined; and, according to the doctrine contended for, it cannot convey the same until some person has wrongfully claimed title to, or intruded upon the possession of, the lands escheated.

3. If the law of Michigan ever required that the title of the State to lands escheated for want of heirs, should be judicially established before the State could convey, this rule was abrogated by the act of 1846.—*Comp. Laws, § 280.* This act authorizes the trustees therein referred to *to take charge of* lands so escheated, to sell or otherwise dispose of them, and to convey by deed to the purchaser thereof 'all the rights of the State therein.

The power to sell and convey is unqualified. There is

nothing in the act which indicates that the trustees are required to cause the title to be judicially established, and to take possession before sale and conveyance of the rights of the State. If such had been the intention, it would have been distinctly expressed. No intent of that kind can be fairly deduced from the direction to "take charge of" such lands. Certainly that is not the meaning of similar language in the preceding section 277 of Comp. Laws. These words are used in their ordinary and popular sense, and do not necessarily or naturally imply any more than they would import in a power of attorney of a private owner, authorizing another to take charge of and sell his real property.

4. It is claimed that the act of 1846 extends only to escheats to the State since its organization. This construction of the act is so clearly erroneous as to require no comment.

5. The Court also charged that the act of 1846 related only to lands escheated for want of heirs. But the words of the statute are "legal heirs," i. e., heirs competent to take.

VI. The right of the plaintiff to recover is not affected by the lapse of time since the escheat accrued, or since Edwin Reeder took possession.

1. Statutes of limitation do not run against the State, except by express statutory provisions.—*Sedgwick on Stat. and Const. Law, 106 ; 2 Washburne on Real Prop., 499, 525 ; People v. Gilbert, 18 Johns., 227.*

This is only an application to the States of the unquestioned rule of the common law, *1 Coke, 74 ; 1 Blackst., 247 ; Broome's Leg. Max., 247,* which rule also prevails as to the Government of the United States.—*Lindsey v. Miller, 6 Pet., 666.*

Before the statute of 1846 there was no statute of limit-

ation which affected the rights of the State of Michigan as to land. The first statute which extended its provisions to the rights of the State took effect March 1, 1847.—*Rev. Stat. of 1846, 600 ; 2 Comp. Laws, 1405.* Section 11 of this act would be fatal to the claim of plaintiff but for the express provision of section 9 of the same act.

This provision coincides with what has been adjudged to be the general policy of our limitation acts, viz: that all causes of action should be governed, as to limitations, by the law in force when the cause of action accrued.— *Joy v. Thompson, 1 Doug., 373 ; Lastly v. Cramer, 2 Id., 307 ; Hurlburt v. Merriam, 3 Mich., 144 ; Perry v. Penniman, 4 Id., 165.* The right by escheat accrued, in the case at bar, long previous to 1846, when the first statute affecting the State was passed.

2. The principle of presumption of grant has no application to this case. Reeder's own testimony shows what his only claim of title was, and is inconsistent with the presumption of a grant.

3. There can be no possession adverse to the State.— *2 Washburne on Real Prop., 525 ; People v. Van Rensselaer, 8 Barb., 194.*

VII. The testimony of Eliza Reeder, that, in 1853, Edwin Reeder told her that his wife, Maria Yorke Harvey, told him during her lifetime, that when she left England she had two sisters there who were married and lived at Birmingham, was inadmissible.

If there were two persons residing in Birmingham at the time referred to, who claimed to be the sisters of Maria Yorke Harvey, their existence, or the existence of their descendants, is susceptible of proof by the direct and positive evidence of those who knew them, and cannot be proved by mere hearsay. If such declarations are admissible for any purpose, it is only for the purpose of proving the

relationship between Maria Yorke Harvey and certain per-
sons shown by direct and primary evidence to have lived
in Birmingham, who were claimed to have been her sisters.
—*Rishton v. Nesbitt, 2 Mood. & Rob., 554; 1 Phill. Ev.
by C. & H. (4th and last ed.), 254, 173, note; Mima Queen
v. Hepburn, 7 Cr., 290.*

VIII. General evidence showing that no person compe-
tent to take was known to exist, or, upon due inquiry, had
been found to claim the premises, as heir-at-law of the
person last seized, was all that was requisite to make out,
*prima facie,* a case of escheat for want of heirs.—*People v.
Fulton Ins. Co., 25 Wend., 215; Doe v. Willey, 8 B. & C.,
22; Doe v. Deakin, 2 Man. & Ryl., 195; Doe v. Griffin, 15
East., 292; Celis v. Oriol, 6 Lou., 403; Samford v. Toad-
vine, 15 Lou. Ann., 170; Greenleaf v. Birth, 6 Pet., 302.*

*D. B. & H. M. Duffield, Geo. V. N. Lothrop, and A. D.
Fraser,* for defendants in error.

The plaintiff's claim to the property in question is
founded on the assumption that it has escheated under the
laws of the late Territory of Michigan, in the year 1825–6
or 1827. It is important, therefore, to inquire whether the
law of escheat then in force here, if any existed, depended
on statute or common law.

I. The first provision on this subject is embraced in an
act adopted by the Governor and Judges, "directing the
descent of intestates' estates," dated the 27th of July, 1818,
in the Code of 1820, page 29, which declares that "for
the want of heirs the estate shall accrue to the Territory;"
and the same enactment is repeated in the Code of 1827,
page 64, section 1.

1: In reference to both of these provisions, we insist
that they were illegal, incompetent, and in violation of the

provisions of the Ordinance of 1787, which then constituted the organic law of the Territory. The first of them was not only not authorized by that instrument, but was against its express terms. The powers and duties of the Governor and Judges are very clearly set out, and so are those of the Legislative Council; both are circumscribed. The government was intended to be dependent, temporary, limited, and subject to the will of Congress, and the Ordinance was afterwards adapted to the federal Constitution. The Governor and Judges were not only restricted as to the subjects and objects, but to the sources of legislation; they were to "adopt such laws of the original States, civil and criminal, as may be necessary and best suited to the circumstances of the district," but they could not repeal them. And although the canons of inheritance were placed beyond their reach by the terms of their powers, they did not hesitate to change them in very important particulars, and to superadd the clause creating an escheat, as we have seen. The powers of the Legislative Council were also defined, qualified, and restricted; they had "authority to make laws in all cases for the good government of the district, not repugnant to the principles and articles in the Ordinance, established and declared." It cannot be doubted for a moment, therefore, that the act of the Legislative Council, so far, at least, as it creates or prescribes a law of escheat, is equally incompetent and invalid. It was the exercise of a power which had never been delegated to those local bodies,—an attribute of sovereign power,—the assumption of a prerogative of an independent State. It must be conceded that these temporary, local legislatures, had erred and usurped power like their successors in the Northwest Territory.—*1 Chase's L. of Ohio, 20, 25, 26.*

2. These two acts were illegal and incompetent in another point of view,—the property could not *escheat to*

*the Territory* under any state of facts, and must, if it were escheated, have escheated to the United States, who alone could have enforced it. They then held and exercised the sovereignty of Michigan, from which this property had been originally derived.—*2 Black. Com., 56 (73); 2 Greenlf. Cruise, 188—9; 2 Washb. R. P., 436, sec. 3, and note; 4 Kent Com., 424, 259, note; Williams v. Wilson, 1 Martin and Yerger, 248.*

The Territory being a mere temporary organization under the general government, and not possessing any of the attributes of sovereignty, the title could not possibly vest in it, nor had it the capacity to enforce, take, or hold it. The United States was the only sovereign power that could maintain these proceedings, if, as is alleged, an escheat occurred while Michigan was a Territory.

3. In order to maintain this suit, it is indispensably necessary to show *that the property in question escheated directly to the State,* and not to the Territory. It is in respect to such property only that the trustees have any power: *" they shall take charge of all lands or other property which may have escheated, or which may hereafter escheat, to the State."* This language admits of but one construction. The deed granted by the trustees, therefore, falls to the ground.—*1 C. L., 170.*

The statutes, therefore, cannot be the foundation of an escheat. We are, therefore, necessarily referred to the common law as furnishing the only rule and course of proceeding on this subject, the nature of which it is now proper to consider.

II. The legal right of escheat arises from the law of enfeoffment—lies when the tenant in fee dies seized, without heirs, that the lord may have the lands in *lieu of his services;* but if another, by the implied assent of the tenant, obtained and continued in possession, that prevented

escheat, if he had actual seizin, although he had no right to the tenements. From these cases and authorities, it must be allowed to be settled that the law did not regard the tenant's want of title as giving the lord a right of escheat. The escheat could only arise when there was a defect of a tenant, and when there was a feoffee that was a tenant.—*1 Wm. Black., 174–5, Burgess v. Wheate; 1 Eden's R., 144–5, 152, 170 to 181, S. C.; F. N. B., 337 (144).* Cases of this nature have not been favored in courts of law or equity, either in England or in this country. It has been repeatedly held that even voidable deeds shall bind the escheat; an infant's deed shall bind the lord; so a lease by a husband of his wife's lands, without her joining. So, for the purpose of binding the lord in escheat, deeds have been held good against him, that would have been held void in other respects, because they excluded the lord while there was a tenant.—*1 Eden, 150, 152, 171, 172; 8 Bacon, 16; 5 Rawle R., 111.*

III. If we assume that the doctrine of escheat, either by statute or common law, existed here at the period alluded to, and that the property in controversy escheated, on any ground, an inquest of office was essentially necessary to be executed, in order to give seizin to 'the sovereign power;' and as the property was not vacated it was necessary also to seize it before the government could be considered in possession.

1. This proceeding was devised by law as an authentic means to give the king his rights by solemn matter of record, without which he in general can neither take nor part with anything. For it is a part of the liberties of England, and greatly for the safety of the subject, that "the king may not enter or seize any man's possessions, upon bare surmises, without the intervention of a jury." And until the sovereignty be in possession, in due form, it

CRANE v. REEDER.

cannot dispose of the property either by patent, legislative act, or otherwise. These positions are sustained by the following authorities: *Com.'s Dig. Escheat, B. 1; 2 Bl. Com., 245, note; 8 Bacon's Ab. Pr., 98, 99, 100; 1 Do., 203; 12 East, 96, 108, 110, Doe v. Redfern; 6 Leigh, 588, 594, Com'th v. Hite; 2 Peters' Cond., 622, 629, 630, Fairfax v. Hunter; 16 Pickering, 177, 181, Wilbur v. To- bey; 7 Wend., 367, Jackson v. Adams; 1 Litt. R., 60, Barbour v. Nelson; 5 Peters' R., 436, Bradstreet v. Hunt- ington; 13 Wend., 548, Bradstreet v. Supervisors; 5 Cal- ifornia, 373, People v. Folsome; 2 Washb. R. P., 436, 7 Notes; 3 Johns R., People v. Cutting; 1 Sneed R., 355, Puckett v. The State; 2 Harris & McHenry, 137-9, Ryan v. Boyd, 18 Mich., 208; Sheffield v. Ratcliff, Hobart's R., 527; 3 Pick., 224.*

2. The inquest of office has been in universal use, in the several States of this Union, or something tantamount to it; and it has been in force here, by statute, since 1838, and is still.—*Code of 1838, p. 504, §§ 7, 8, 9; Do., 1846, p. 593, § 27; 2 C. L., 1395, § 27; Cross v. De- Valle, 1 Wallace, 8; Ostrander v. Baldwin, 6 Wallace, 122; U. S. v. Supervisors, 4 Wallace, 446; Sedgw. on Stat., 439; Clark v. Protec. Ins. Co., 1 Story, 109.*

The law of 1846 requires procedure in pursuance of these statutes in cases of escheat. See *Laws of 1846, p. 273.*

3. Its existence here, and its enforcement, are in perfect harmony with the statute appointing trustees. Nay, it is absolutely necessary to enable them, knowingly and under- standingly, to perform their duties and to guard against intrusion.—*2 Peters' Cond., 629, 630, 631; 1 Litt. R., 61, Barbour v. Nelson; 3 Litt. R., 38, Robinson v. Huff.*

It cannot be denied that the defendants had rights which were beyond the reach of legislative interference or usurpation. Assume it to be what the plaintiff asserts, we

urge "that a title by seizin and occupation is a property, as much as any other title, though not equally indefeasible; yet equally beyond the control of the Legislature in any private or special statute."—*3 Mass., 118, Little v. Frost.; 5 Denio, 426, 429, Roseboom v. Van Vechten.*

If our own code fails to furnish the remedy we insist on, it is very certain the common law supplies the deficiency, and that it must be resorted to in this case, unless, indeed, it should conflict with the provisions of the act appointing and defining the powers and duties of the trustees; but no such conflict exists. Statutes in derogation of the common law are to be construed strictly, especially when they infringe on individual rights.—*2 Mich., 486, Sibley v. Smith; 3 Mich., 309, Maynard v. Cornwell; 4 Mich., 322, Brown v. Fifield.*

The statute alluded to must be construed in the light of the common law.—*Dwarris, 42, 43, 48, 56 ; 13 California, Baker v. Baker.* If a statute gives a remedy in the affirmative (without a negative expressed and implied) for a matter which was actionable at the common law, the party may still sue at the common law as well as the statute, for this does not take away the common law.—*5 Cowen, 165, Crittenden v. Wilson; 2 Inst., 200.; Comyn's Dig., Action on Stat., C; 1 Chitty, 131 and Notes.* "If by interpretation the common law and the statutes may stand together, they shall so stand."—*Smith's Com. on Statutes, 879, § 757 ; 4 Gill. and John., 6 Canal Co. v. Railroad Co.* "The trustees were acting under a naked power. If the power was too strait for practical utility, they should have asked a new grant."—*4 Hill, 99, Sharp v. Johnson.*

A statute shall never have an equitable construction in order to overthrow or divest an estate.—*2 Dallas, 316, Van Horn v. Dorrance.*

It will not escape observation that the Legislature does not attempt to *vest the title* to any escheated property in the trustees, but merely gives them the ultimate disposition of it. And yet the only class of cases where it has been held that the inquest of office had been dispensed with, was where the law directly vested the property in a third party.—*2 Washb. R. P., 437.*

4. The escheat must be enforced by the sovereign power to which the property reverted, and by none else. The United States only could do so here, if any grounds existed for it. This is based on the theory that the sovereign is universal occupant, and all property is presumed to have been originally in the crown, and therefore the king takes when it becomes destitute of an owner.—*8 Bacon's Ab. Preg. B., 13 ; Schultes on Aquatic Rights, 129.* And we apprehend that this principle prevails, although the benefit of the escheated property may have been appropriated to special purposes.—*18 Dig., 278 ; 12 East, Doe v. Redfern ; 5 California, 373, People v. Folsome ; 1 Sneed, 355, Pucket v. State.*

5. The general government could not and have not transferred to this State any right, title, or interest in the property in question, until its own right was perfected and matured. It is scarcely necessary here to state that Congress never legislated upon the subject.

IV. Another ground upon which it is claimed that the property in question escheated, or by which the course of descent is sought to be interrupted, is alienism.

1. It must be borne in mind that when the American Government obtained the possession of Michigan, nearly all her population were aliens, and a large number of them the subjects of two successive and rival sovereigns. Few American citizens were of the number. It was in view of this state of things that the most liberal provisions were

incorporated into Jay's Treaty for the protection of the rights, all the rights, of British subjects or American citizens, and more especially the rights of property in Michigan.—*Vide Jay's Treaty, in 8 U. S. Laws, pp. 117, 122, Arts. 2 and 9; 1 Mart. & Yerger, Silver v. Ladd, 7 Wallace, 219; Vide also Opinion of Cushing, Atty. Genl., Vol. 8, 411.*

By the former of these articles, all settlers were assured that they should continue to enjoy unmolested "all their property of every kind, and be protected therein;" that they might remain here or remove, and might sell their lands, houses, and effects, or retain them; and might continue to reside here and still remain British subjects. By the latter article British subjects who held real estate here were not, so far as regarded the same and the legal remedies incidental thereto, to be deemed as aliens. It is worthy of notice, too, that the 4th Article of the Ordinance of 1787 for the government of the Northwest Territory, which was adopted by the Congress of the Confederation, in anticipation of the surrender of the country under the Treaty of Paris, draws a clear line of distinction between "the citizens of the United States and the inhabitants and settlers of the Territory."

2. The policy thus indicated by the General Government was early carried out by the Governor and Judges of this Territory, in the adoption of two laws in 1805, conferring capacity on aliens to purchase, hold, and sell real estate, in the same manner as a citizen of the United States; they might take by "devise or descent."—*Woodward Code, pp. 16, 45.* These acts were preserved and continued, by their titles, in the *Cass Code of 1816, p. 32.* In the Code of 1820, at p. 450, one of these acts is repealed by its title, and the other fell under a general repealing clause, at page 451, but it is most manifest that this was

inadvertently done. The unintentional repeal of *both* of the alien acts, instead of one, seems to have escaped observation until the 31st of March, 1827, when the Legislative Council not only *restored* the law in its most comprehensive form, but also declared that the title of any person *"should not be questioned or impeached by reason of the alienage of any person or persons* from or through whom such title may have been derived." And these or similar provisions have been incorporated in all succeeding Codes up to the present day; and also qualifiedly introduced into the Constitution of 1850.—*Code of 1827, pp. 272, 223 ; Of 1833, pp. 282, 385 ; Of 1838, pp. 266, 467 ; Of 1846, p. 271 ; Of 1857, p. 857 ; 1 C. L. 75, Const., A. 18, § 13.* In this connection we also refer to an able opinion of Judge Redfield, in case of *The State v. Boston Railroad Co., 25 Ver., 433.* Also a dissenting opinion in *Stemple v. Henningheiser, 3 Iowa, 408.*

3. We insist that it was in harmony with these principles that Congress passed the "Act regulating the grants of land" in this Territory, of the 3d of March, 1807.— *Vide Land Laws, 545.* By its provisions, grants were to be made "*to every person* or *persons* in the *actual possession, occupancy,* or *improvement* of any tract or parcel of land, on or before the first day of July, 1796," or by any person under whom they should claim, "if such possession had been continued to the date of the act; and such person, it is declared, shall be confirmed in the title to such tract as an estate of inheritance in fee simple." It seems the property in question was confirmed and patented to one John Harvey under this act; and the defendants insist, with confidence, that the act in question (which was adopted while the alien laws above referred to were in force here) conferred upon him, if an alien, the capacity and power of receiving, holding, and transmitting, by hered-

itary descent, to his heirs, even if aliens, the real estate thus granted, or, as the Supreme Court of the United States said in reference to the terms of Jay's Treaty, "the treaty enlarged the *capacity* to take by descent free from the taint of alienage." That such would be the effect of the grant in question, is abundantly established by authorities.—*4 Peters' Cond., 511, Orr v. Hodgson ; 5 Cowen, 314, 321, Jackson v. Ely ; 7 Wend., 369, Jackson v. Adams ; 20 Johns., 693, 707, 733, Goodell v. Jackson ; 1 Bacon's Ab., 197, under treaty of 1783 ; 3 Selden, 305, 1 Cowen, 89, Notes ; 3 Pickering, 224, Commonwealth v. Heirs of Andre ; 9 Metc., 157, Piper v. Richardson* affirms *Orr v. Hodgson.*

4. Rights thus acquired are not subject to be affected or defeated by the repeal or expiration of the laws under which they were obtained.—*4 Peters' Cond., 118, Chirac v. Chirac.*

5. Again, we insist, under this head, that alienage has never been declared by our law to be a ground of escheat or forfeiture of real estate. A reference to the various Codes will demonstrate this fact.

6. And the very statute constituting the Board of Trustees, from whom the plaintiff claims to derive his title, expressly restricts them " to take charge of all lands, or other property, which may have escheated, or which may hereafter escheat, TO THE STATE, by reason of the owner thereof dying intestate, and leaving no legal heirs thereto. *1 C. L., 170.*

V. It was admitted, on the trial in the Court below, by the plaintiff, as appears of record here, that the late Edwin Reeder had and held adverse possession of the property in controversy, under a claim of right, from the year 1831 to the 31st of January, 1869, when he died testate. This was an actual, visible, and exclusive appropriation of the property, commenced and continued under a claim of

right, for a period analagous to the statute of limitations, and comprehends the exercise of all acts of ownership on the part of the defendant (in hostility to all the world), as well as the improvements thereon and the sale of parts thereof.—*Angell on Limitations, 473–6; 2 Smith's Leading Cases, 492 and Notes; 11 Peters, 41, Irving v. Burnett; 1 Howard, 43, 51, Mercer v. Selden; 29 E. C. L., 14, Doe v. Gregory; 5 Peters, 439–40, Bradstreet v. Huntington; 3 Watts, 73, McCall v. Neely; 2 Greenleaf's R., 275–281; 5 Denio, 426, Roseboom v. Van Vechten; 7 Barbour, 92, 101, Burnham v. Van Zant; 3 Starkie's Ev., 1099; McClure v. Hill, 2 Const. Rep. Sc. 420, 424; Cowper 218–219–220; Edson v. Munsell, 10 Allen, 597.*

1. Twenty years' adverse possession is a positive title to the defendant. It is not a bar to the action or remedy of the plaintiff only, but takes away his right of possession as well as of property. It operates by way of evidence.— *1 Burr, 119, Taylor v. Horde; 2 Smith's L. Cas., 491.*

2. The long possession, thus acquired and maintained, and under such circumstances, justified the presumption of a grant, and makes it the duty of the Court so to charge. The doctrine wholly rests on long and undisturbed possession, and is very fully set forth in the following authorities: *1 Greenleaf's Ev., §§ 32, 33, 34; 5 Peters' Cond., 238 etc., 244–5, Ricard v. Williams; 5 Conn., 291, 301, Camp v. Camp; 2 Wend., 36, 47, 48, 60, Schanber v. Jackson; Angell on Adv. Poss'n, 18, 40, 44, 68; 24 Pick., 322, White v. Loring; 4 Howard, 297, Zeller vs. Eckert; 2 Conn., 607 to 610, Sumner v. Child; 22 Pick., 85, Valentine v. Piper; 6 Peters, 513, Barclay v. Howell; 10 Peters, 431, 445–446;*

3. And this presumption will operate against the Crown, the Government, and the State.—*1 Greenleaf's Ev., §§ 45, 46; 8 Bacon's Ab. Pre., E. 94; 3 Bacon's Ev. H., 619, 620; Mathews' Ev., 5, 6, 11, 12, 13, 195, 196, 201,*

CRANE v. REEDER.

*234-5; 3 Starkie's Ev., 914, 915, and Notes; Cowper, 102, 110, 215; 12 East, 280, 488, Hillary v. Waller; 2 Starkie's Ev., 336, 832; 3 Serg't and R., 509-10, Mather v. Trinity Church; 1 Phillips' Ev., 161; 2 Phillips' Notes, 354-5-6, 366; Angell on Ad. Poss'n, 17; 10 Iredell, 516, Reed v. Ernhart; 26 Geo., 582, Dickery v. Benson; 4 Dev., 186, Rodgers v. Mabe; 11 Iredell, 465-7-8, Bullard v. Barksdale; Nichols v. City of Boston, 98 Mass., 41.*

4. And this presumption or inference is drawn for the purpose, and from a principle of quieting possession, not from a *belief or supposition* that the instrument inferred actually existed.—*Angell on Ad. Pos., 17, 69, 70, 105; Cowper, 215, 102; 2 Conn., 622-3, 630, Sumner v. Child; 1 Greenleaf's Ev., §§ 32, 46; 3 Starkie's Ev., 914; 8 Bacon's Ab., 94; 3 Bacon's Ab., 620; 12 Ves., 266, Hillary v. Waller; 10 Johns, 380, Jackson v. McCall; 4 Dev., 180, 186 to 195; 11 Iredell, 461-5-7-8-9; 3 Johns. Cases, 116- 119, Jackson v. Lunn; 10 Iredell, 516, Reed v. Earnhart.*

VI. The defendants also set up the Statute of Limitations of 1846, in bar of this action.—*2 C. L., 1403, §§ 1, 2, 3, 11, and also the acts of 1820 and 1829.*

When possession has been held for the statutory period, unless it is shown to have been virtually a tenancy, undisputably by the tenant, at some time in the interval, the bar is complete. "Acquiscence, which is merely inaction, is the very thing which the statute contemplates as creating the limitation, which cuts off the right."—*18 Mich., 378, Bower v. Earl; 9 Metc., 157, Piper v. Richardson; 8 Cowen, 611, Le Frambois v. Jackson; 22 N. Y. (8 Smith), 44, People v. Trinity Church; Sedgwick on Statutory and Const. Law, pp. 60 and 61.* A new rule is laid down in section 11 of statute of 1846, for a new subject, viz.: the State. *Vide* the case of *Lastly v. Cramer, 2 Doug., 307,* as to construction of word "accrue."

21 MICH.—H.

VII. The adverse possession of the premises, the payment of taxes thereon, to both the Territory and State of Michigan, by the late Edwin Reeder, for a period of 44 years, and the acceptance of the same, is a waiver of the right of escheat, if any had taken place.—*2 Black. Com., 245; 1 Black. R., 174-5, Burgess v. Wheate; 2 Harris and McH., 130-7-8-9, Kelly v. Greenfield; F. N. B., 337 (144); 10 Iredell, 519-520, Reed v. Earnhart; 4 Dev. & Bat., 107, Chandler v. Lunsford.*

VIII. As to the admission of Eliza Reeder's testimony: In cases of pedigree (which embraces not only descent and relationship, but also the facts of both marriage and death), hearsay evidence is received, to show the declarations of deceased persons who were related, by blood or marriage, to the person, and therefore interested in the succession in question.—*1 Greenleaf's Ev., §§ 103-4, and Notes; 1 Howard, 230, Jewell v. Jewell, 231; 9 E. C. L., 330, Johnson v. Lawson, 330-333 ; 1 Crompton, M. and Roscoe, 927, Crease v. Barret ; 1 Peters, 337, Elliott v. Piersall; 10 Peters, 434-8, Ellicot v. Pearl; 4 N. H., 378, Walden v. Tatle; 2 Conn., 348, Chapman v. Chapman; 10 Clark and Finnel's R. H. of L., 500-503, Robinson v. Attorney General,* quoted in last edition of *Phillips on Evidence, 1 vol., 219; Buller's N. P., 294-5; 46 E. C. L., 524-5, Davis v. Lowndes; 10 E. Ch. Cond. ( 7 Simmons, 595 ), 224, 226, Slaney v. Wade; 6 Cond. Ch. R., 431, Monkton v. Attorney General, 437; 1 De Gex and Smale, 40, Boucher v. Shields; 2 M. and Rob., 252, Rishton v. Nesbitt; 4 Gill & Johns., Ch. Hall School v. Greenwald.*

IX. The defendants offered in evidence the deed granted by Harvey to his daughter, dated 27th April, 1823, of the property in question. It was objected to by, the plaintiff, for the want of subscribing witnesses, and admitted. We hold that it was clearly admissible on legal principles.

Independent of statute, a deed of conveyance was good at common law, if it was signed and sealed by the party, without witnesses.—4 Kent, 451–2; 3 Mich., 585, Dougherty v. Randall; 1 Foster, 409; 12 Metc., 157, 162–3–5; 1 S. and R., 72; 12 Johns., 73; 1 Ohio, 1, 12, Moore v. Vance; 9 S. and M., 335; 6 Peters' R., 136; 2 J. J. Marsh, 434; 17 Barb., 108; 5 McLean, 112.

The requirements of the statute were designed for the benefit of subsequent purchasers, but as between the parties themselves, they were wholly unnecessary. The statute was not designed to lay down an exclusive rule. This very question was reserved by this Court in the case of Galpin v. Abbott, 6 Mich., 37. We have already seen that voidable, or even void deeds, are sufficient to defeat an escheat.

CAMPBELL, CH. J.

Crane, the plaintiff, sued defendants to recover certain lands in Wayne county, claimed by him to have escheated to the State, and to have been conveyed to him by the Trustees of Escheated Lands.

The land was deeded in 1801 by Todd & McGill to John Harvey, to whom it was afterwards confirmed by the United States under an act of Congress regulating grants of land in the Territory of Michigan, whereby all persons residing in the Territory and occupying lands which they or their grantors had continuously occupied and improved since and previous to July 1, 1796, were entitled to estates in fee simple. The patent issued in 1811. Harvey, whom the testimony tended to show to have been an Englishman, married here, but with no children born in this country, removed in 1816 to Indiana, where he died in 1825. At that time a person, described as his daughter, was living with him, she being

English by birth, and having reached this country some years before his death, but after her majority. She died in 1826 or 1827, leaving a husband, Edwin Reeder, but never having had any child. On the 27th of April, 1823, a deed was executed by John Harvey to this person, named Maria Yorke Harvey, purporting to be acknowledged, but not witnessed. It is claimed that Harvey was an alien, and that his daughter was an alien and could not inherit from him, in case the deed was void. It is also claimed that Maria Yorke Harvey died without heirs. Reeder went into actual possession some time after his wife's death, and continued so until his death, in 1869. Defendants claim under him. He set up no title, except by possession.

The questions presented upon the record are both new and important, and the very thorough and elaborate arguments on both sides have given us all the aid we can expect to get in the discussion from any source. We are, therefore, assured that in examining the questions involved, we have at least, heard all that is likely to be found.

The first question presented is, whether the deed from John Harvey to Maria Yorke Harvey was valid to convey title to her. It is claimed by defendants to have been a good common-law deed. It is not claimed that it would be good under the statute without the aid of the common law. The Ordinance of 1787 provided that, until otherwise declared, lands might be " conveyed by lease and release, or bargain and sale, signed, sealed and delivered by the person being of full age in whom the estate may be, and *attested by two witnesses, provided* such conveyances be acknowledged, or the execution thereof duly proved, and be recorded within one year after proper magistrates, courts, and registers shall be appointed for that purpose." The law of 1820, which governed the deed in question, was the same, so far as witnesses are concerned. We think that

this statute was designed to cover the whole subject until further legislation, and that it cannot be supposed any common law was to prevail over it, even if there had been any such law in force when the Ordinance became operative. A deed at common law was not sufficient without some enrollment, or some act *in pais*, to transfer title, and under the Ordinance, which recognized the fact that in this country there must be many non-resident owners, and much unoccupied land, a new rule was devised to take the place of all forms and ceremonies not mentioned there, and which would have been onerous and impracticable. It has been held, and we think correctly, that under such statutes, the witnesses are essential to the validity of the conveyance.—*French v. French, 3 N. H., 234; Courcier v. Graham, 1 Ham., 330; Patterson v. Pease, 5 Ham., 190; Merwin v. Camp, 3 Conn., 35; Clark v. Graham, 6 Wh., 577.*

It is true that the common law has been practically recognized here in most things, ever since the American authorities assumed complete control, or at least, ever since the Territory of Michigan was organized. But in 1810 it was found necessary by express legislation to abolish the custom of Paris, and the English, French, Canadian, and Northwest Territory, and Indiana statutes, and other ordinances, for the reason that they did not exist in any attainable form, and the people were liable to be ensnared by their ignorance.—*L. 1821, p. 459.* But we are bound to know, as matter of legal history, that the law which governed this Territory in civil matters, prior to the taking effect of the Ordinance, and when Jay's Treaty was negotiated, was the French law, including the custom of Paris, as modified by royal edicts. Under that law, deeds always required the attestation of a notary and one or more witnesses.—*Parfait Notaire, Bk. 1, Ch. 14.* And for some time after the organization of Michigan, it was customary

for the French settlers to convey by deed in the same form which had been used under the old system, by what purports to be a notarial contract, made before a notary and one or more additional witnesses. Some of these conveyances are preserved in the records of the commissioners who acted upon Harvey's claim.—*See Am. St. Papers, vol. 1, Pub. Lands, 420, 430, 446, 455, 456, etc.* It would have been unsafe and productive of great injury, if the laws had not undertaken to settle the formalities of deeds in a region where there were no adequate means for determining what the former written or unwritten law was.

John Harvey must be regarded as having died seized of the land in controversy. He had no heirs, who were American citizens, or who were born after· he acquired his title. And the question arises whether his alienage, or the alienage of any supposed · heirs, or the death of Maria Yorke Harvey (or Reeder) without any heirs at all, operated, and if so, when and how, to create an escheat. And a further question then arises, whether the escheated estate has come lawfully into the plaintiff, Crane.

There is no serious question raised in regard to the capacity of Harvey to transmit to any lawful heirs, if he had any. The statute of 1807, under which he obtained his patent and confirmation, provided that the grantee should take an estate in fee simple. It would be contrary to the plain intent of this statute to allow the grantee himself to be ousted for alienage. The law was passed to carry out the equities of Article 2 of Jay's Treaty of 1794. It having been ascertained that there were but six valid titles in the district, it became necessary to do something to protect those who had been honestly in possession, but had not been able to procure titles of any kind, complete or inchoate, before the country came into our hands. Congress, in a very liberal spirit, decided to recognize all

who were in actual possession, occupancy, and improvement, and who, or whose grantees, had been continually so since prior to July 1, 1796, as entitled to receive a grant in fee simple. Many of these were presumably . aliens, but the treaty had removed the objection of alienage as to lands held by good title at that date, and in *Forsyth v. Reynolds, 15 How., 364,* it was held that the act of 1807 was intended to reach the actual settlers under Article 2, who could not be expected to have obtained valid titles which would be covered by Article 9. These settlers were, by Article 2, allowed to remain and dispose of their effects without becoming citizens, if they should in .writing elect to continue British subjects. Article 9 provides expressly that the alienage of those owning valid titles shall not interfere in any way with sale, devise, or inheritance. Article 2 contains no such provision as to settlers not having such titles, because they had no estates of inheritance, but leaves them at liberty to go or stay, and to sell such property as they have, or keep it. It was held as a rule of public law, applicable to such cases, in *U. S. v. Repentigny, 5 Wall., 211,* that the privileges thus secured by a treaty could not be claimed by any persons not accepting a new allegiance, except in strict accordance with the treaty provisions. And the act of Congress, proceeding on this theory, did not attempt to extend its privileges to any who were not, when they presented their claims, in actual settlement and occupancy, which had been continuous; while as to claims under Article 9, neither occupancy nor residence was essential.—*Orr v. Hodgson, 4 Wheat., 453.* And in this latter case it was held that although Article 9 declared positively that, as to lands owned at the date of the treaty in 1794, neither the owners nor their heirs or assigns should be regarded as aliens, yet this did not reach heirs or assigns who were not British subjects or American citi-

zens, and did not protect descendants who were subjects of
Venice. And, inasmuch, as the treaty did not provide, and
the act of Congress covering the case before us does not in
terms declare, that aliens of any kind may inherit from the
settlers whose possessory rights were confirmed and enlarged
into freeholds, the question arises whether there is any
other rule or provision from which such protection can be
deduced. For if under this statute of 1807 any alien heirs
could take, the result must be that all could take; and
those who had no actual rights under the treaty, except to
equitable consideration, would have privileges extended to
their relatives which would be broader than those secured
to perfect titles under the treaty, which extended only to
British and American heirs, and not to heirs without refer-
ence to nationality.

It is clear that no such right could be deduced from
the Territorial statutes adopted by the Governor and Judges
in 1805, allowing aliens to take and hold lands.  Those
laws were repealed before the death of John Harvey, and
before any rights could vest in any supposed heirs.  But
his title was not derived under those acts, even if they
could bear the construction that an estate taken by an
alien, while they were in force, operated at once and irrev-
ocably to confer exemption from the disabilities of alien-
age for all time to come upon his descendants and
relatives.  The title obtained under the act of Con-
gress of 1807 was held in *Forsyth v. Reynolds* to be
only a confirmation of the original purchase, which
was prior to the passage of those statutes.  And as
hinted in *U. S. v. Repentigny*, if he had purchased from
Government in the usual way, it is at least doubtful
whether such statutes could confer upon aliens any such
indefeasible right to purchase Government lands and trans-
mit them to alien heirs without Congressional permission.

But all that can be claimed under any such statutes is. that they protect rights which become vested while they are in force. They cannot operate to prevent future legislation from barring the vesting of any new interest. This question was settled under a treaty,—which is the most solemn form of a law, combined with a compact,—in *Chirac v. Chirac, 2 Wheat. R., 259*. The treaty provided expressly that heirs should inherit without being naturalized; and a person who, as a French citizen, had purchased lands under it, died after the treaty had expired, seized in fee of those lands, leaving heirs who were French subjects. It was held that although his title remained good while he lived, yet they could not take under the treaty, and that their rights depended on the local law.

It is claimed, however, that under the Ordinance of 1787, the intention existed to do away, in the rules of inheritance, with all questions of alienage, and that the policy of the Government has always been to put aliens on as good a footing as citizens. But we have not been able to trace any such intention in the action of the United States. There has always been a policy aimed at inducing aliens to become citizens, but none which would render it indifferent to them whether they became citizens or not. On the contrary, there are no courts in the country which have enforced the disabilities of aliens who do not seek citizenship more uniformly than the courts of the United States. And the laws and treaties speak the same language.

The only color for claiming such a construction for the words of the Ordinance, is because it does not say, when declaring the rules of descent, that the relatives must be American citizens, and because it applies the same rules to the estates of "resident and non-resident proprietors." But there are probably very few statutes which undertake to

mention specifically the citizenship of those who are to be affected by them. It is implied in all statutes that they shall be read in accordance with the recognized rules of interpretation, and apply to such persons or things as fall naturally within their scope. It is not customary in passing acts to express such disabilities as should be implied. And alienage has been recognized in all common law, and in most, if not all other countries, as a disqualification to hold land in fee. Citizenship gave the same rights to residents and non-residents, and the law did not require aliens to be included in order to satisfy its terms. Moreover, at the time this Ordinance was passed, it is a matter of history that the State authorities were very tenacious in refusing to enforce even the treaty rights of Englishmen, and had confiscated and appropriated many estates which were afterward restored. We had also several treaties,—some of which were with nations to whom we desired to extend special favor,—which had provided for rights in real estate on the theory that aliens could not otherwise have the rights of citizens, and all our treaties required reciprocity of rights in the people of both countries. We never had a treaty with Great Britain which gave protection to future purchases of land, or which allowed British subjects to inherit any lands, except such as were owned by British subjects prior to 1794. At the date of the act of Congress of 1807 the policy of the Government had become settled. The treaty of peace protected estates then owned.—*Orr v. Hodgson, 4 Wh. 463.* The treaty of 1794 protected titles lawfully existing at that time.—*Id. Blight's lessee v. Rochester, 7 Wh., 535; Craig v. Radford, 3 Wheat., 594.* But titles accruing after the treaty of 1783, to British subjects dying before the treaty of 1794, were not protected, and did not pass to heirs under the latter treaty, but escheated. —*Blight's lessee v. Rochester.* The treaty with Spain, in

1795, (*8 L. U. S., 144,*) allowed one who would have taken by descent, if he had not been an alien, a reasonable time to sell.—*Art. XI.* The same clause is found in Article X. of the treaty of 1799 with Prussia.—*8 L. U. S., 166.* The convention of 1800, with France, provided more expressly that where aliens could not inherit they might sell to citizens.—*8 L. U. S., 182.* These treaties did not allow the heir to hold indefinitely. No such qualified privilege was ever extended to British subjects after 1794, and the treaties referred to with the continental powers at first, were temporary. And we have already seen their language was not enlarged so as to apply to descents cast after they expired, even though the estates originally vested under them.

There was no occasion for any such interpretation, in order to secure the benefits of the law. The naturalization laws in force at the time, and which continued in force after the death of John Harvey and Maria Reeder, provided that aliens, who had been in the country prior to April 14, 1802, might become citizens at any time, without the necessity of waiting three years after declaring their intention (*2 L. U. S., 154, 292*), and when any alien who had declared his intention, and who had caused himself to be properly registered, died before actual naturalization, his widow and children were to be considered citizens and entitled at any time, without preliminary declaration, to take the oath and become entitled to the rights and privileges of citizens.—*2 L. U. S., 293.* There was nothing to prevent a sale at any time, and every disability could be removed by act of the parties concerned, if they chose.

The laws of Congress manifest a disposition to open the door as wide as possible to induce aliens to become citizens. But they show as plain an intent not to give any special privileges to aliens who do not comply with

the statutes. And it is imposible to give a statute, which simply declares that certain persons who are in actual possession, occupancy, and improvement, and who have succeeded to the claims of others who were in, under similar circumstances, shall be entitled to an estate in fee, such a construction as would transmute it into a statute for making aliens entitled to receive and transmit by inheritance, without doing violence to all rules, and assuming an intent at variance with the known policy of the times. The disability of alienage had never any dependence on feudal tenures, but always rested on the broader principle that States are organized for the benefit of their own people, and that those who are not within the allegiance can have no claim beyond what the law sees fit to give them. In *Dawson's Lessee v. Godfrey, 4 Cr., 321*, the United States Supreme Court expresses the true doctrine on this subject. They say: "Much of the difficulty in satisfying the mind on this subject vanishes upon a just view of the nature of the right of inheritance. Gentlemen have argued upon it as if it were a natural and perfect right; whereas it has its origin in, and is modified to infinity by the laws of society, in exercise of the right of territorial jurisdiction. To be entitled to inherit in the State of Maryland, a right should be made out under the laws of that State. As the common law, which is the law of Maryland on this subject, deprives an alien generally of the right of inheriting, it is incumbent upon the plaintiff to establish some exception in favor of his case. But I know of no exception, at common law, which gives the right to inherit distinctly from the obligation of allegiance existing either in fact or in supposition of law." In *Orr v. Hodgson, 4 Wh., 453*, the language of the Court is equally emphatic. In that case the American nieces of an intestate, who was a British subject holding lands held to be protected by the

treaties of 1783 and 1794, were allowed to inherit to the exclusion of her own descendants, who were Italians. The Court say: "It cannot be presumed, that the treaty stipulated for benefits to any persons who were aliens to both governments. Such a construction would give to this class of cases privileges and immunities far beyond those of the natives of either country; *and it would also materially interfere with the public policy common to both.* We have, therefore, no hesitation to reject any interpretation which would give to persons, aliens to both governments, the privileges of both; and in this predicament are the children of the Countess Barziza. The rule, then, of the common law, which gives the estate to the next heirs having inheritable blood, must prevail in this case."

If non-resident aliens came within the statute for any purpose, so as to receive the benefits which enlarged a tenancy without title into a freehold of inheritance, it was not chiefly for their benefit that the law was passed. It was evidently designed chiefly to protect settlers who had become citizens by not electing to remain British subjects, or whose children, at all events would be native citizens. It has been held in some cases, where a legislature has confirmed rights to an alien and his heirs by name, a design to give them heritable blood must be inferred. But an act that names no one, and says nothing about aliens at all, and requiring no such construction to give it operation, does not stand on the same footing. At common law the king could grant authority to an alien to take land and have it descend to his after-born heirs; but it was held that a patent to such a person and his heirs could have no such double operation as to pass a fee and create the power to inherit also. *Brooke's Abr. "Patent" 63; 4 Cond. R., 339, 340.* A law may have such an effect where the intent is apparent, but the construction, put by the

United States Supreme Court upon the treaties providing exceptions to the disabilities of alienage, shows that this statute cannot fairly be so construed. See also *Brown v. Sprague, 5 Denio, 545, and Governeur's Heirs v. Robertson, 11 Wh., 332,* for a construction of New York and Virginia statutes. In *Colgan v. McKeon, 4 Zabr., 566,* a statute allowing aliens to purchase and hold lands, to themselves and their heirs, was confined in its effect to such heirs as might have inherited from a natural-born citizen, and that alien heirs could not take under it. See further *Stemple v. Herminghouser, 3 Iowa (Greene), 408.*

If John Harvey was an alien he could have no heirs. If he was a citizen no alien could inherit his estate. In either case the title escheated on his death. And if Maria Yorke Harvey had any interest in the land, that also escheated; for at the time of her death there was no law in force authorizing aliens' to hold or inherit lands. The statute of March 31, 1827, did not take effect until January 1, 1828, which was some months after her death.—*R. L. 1828, p. 614, sec. 2.*

The question then arises, whether the title by escheat passed to the Territory or to the United States.

There are various methods, whereby, at common law and under the English statutes, property is said to escheat, that word being used to signify every failure to pass title in the ordinary course of descent to legal heirs or representatives, whether for realty or personalty, and whether for breach of condition, crime, or default of inheritable qualities. And the person or authority entitled to escheated property was not always the same,—some escheats going to private persons, and some to public persons. A glance at the leading features of the English law of escheats will show the difficulty of finding exact analogies here.

First, there were escheats for felony, whereby the inher-

itable blood was destroyed, and whereby the fee of the land passed to the lord of the manor to which it was attached, except where land was held directly of the king, when it went to him. But in all attaints of felony, the king took the land for a year and a day, with unlimited power of waste, and the lord took the inheritance thereafter.—*2 Inst., 37 ; 3 Inst., 392.* And personal estate was in all cases forfeited to the crown, as well as chattels real.—*4 Bl. Com., 387.* But the forfeiture for felony (unlike that for treason) is a branch of the feudal law, and relates directly to the condition of feudal tenures. It did not depend solely upon the character of the crime, and was not inflicted merely as punishment on behalf of the sovereignty.—*Tomlyn L. Dic. "Forfeiture, II.;" 2 Com. Dig. "Forfeiture" (B. 5) note (m).* And it seems that the king's year and day was originally by allowance of the lord of the fee by way of composition for the waste, which is not men-mentioned in *Magna Charta,* and which, although the only original penalty on the land, is said to be an encroachment when added afterwards to the year and day.—*Com. Dig. "Ann, Jour, et Wast." "Forfeiture," B. 5, note (l).* But there was no forfeiture whatever in favor of the king or of the lord in lands held in Gavelkind, which was the ancient tenure previous to the introduction of feuds, and which was said to have been secured from the Conqueror by the compulsion of the free men of Kent.—*1 Record Commission Rep., 492 ; Com. Dig. " Gavelkind ;" Tomlyn Dic. " Gavelkind."* It is said that the Kentish men have an old saying concerning this immunity, "The father to the bough, and the son to the plough."—*Bacon " Use of the Law ;" Com. Dig. "Gavelkind ;" Spelman Gloss., " Gavelkind."* And there was no forfeiture of any lands, however held, for offenses committed on the sea, or beyond seas, if not tried according to

the course of common law, and then it accrued only by virtue of the statutes.—*1 Hale P. C.*, *354-5.*

Nevertheless, in Gavelkind lands, when the felon was outlawed or abjured the realm, his estate escheated; which could only be in that case because of his being put out of the benefits of his allegiance, and becoming to a certain extent like an alien, and thereby deprived of heritable blood.

In treason the lands of the person attainted, held in freehold, were forfeited to the crown and not to the lord; and this is said to have been the law before the establishment of the feudal system in England.—*4 Bl. Com.*, *383.* This extends to Gavelkind lands.—*1 Hale P. C.*, *360.* But not to copyholds, which go to the lord by escheat.—*Com. Dig. "Copyhold M."* And the term "escheat" is said not properly to attach to this class of forfeitures, which belong to the crown by right of prerogative.—*1 Hale P. C.*, *253.* These prerogative forfeitures accrued to the counties palatine and other possessors of royal franchises, as *jura regalia,* the Bishop of Durham holding that right and obtaining the manors of John de Baliol and Robert Bruce by forfeiture of ward.—*1 Hale P. C.*, *254-5.* They did not belong to the lord of the fee.

A third class of escheats embraced cases, where tenures held of the king were forfeited for breach of conditions, express or implied, and require no notice.

A fourth class included cases where the heritable blood was exhausted, by failure of heirs competent to take, in which the land became re-attached to the seigniory for want of a proper and qualified tenant; lands held by feudal tenure being subject to that condition, and the failure operating in the nature of a breach of condition. And such lands only escheated to the king, when not held of any intermediate lord.—*Com. Dig. "Escheat."*

But when lands were granted to aliens, they took for the king's profit, and he could seize the lands by office found during the tenant's life, and upon his death succeeded to the estate in all cases, without reference to the lordship of which it was holden.—*1 Inst., 2.* But no alien can inherit or transmit by inheritance.—*1 Com. Dig.* "*Alien* (*C.*) ;" *1 Bl. Com., 372 ; 2 Bl. Com., 293 ; Governeur's heirs v. Robertson, 11 Wh., 332; Craig v. Leslie, 3 Wh., 563 ; Orr v. Hodgson, 4 Wh., 453 ; Fairfax v. Hunter's Lessee, 7 Cr., 603 ; Blight's Lessee v. Rochester, 7 Wheat., 535.* The right to the inheritance of the lands of aliens is not a feudal right, but it was ancient common law that the king should have the escheat of the lands of all Normans and aliens, *cujuscunque feodi fuerint.—Com. Dig.* "*Prerogative,*" *D. 59.* We have no forfeitures for crime which divest the freehold ; but the case of lands to which no lawful heir exists, must arise in every country. We have no tenures which would stand between the Government and the estate, and it becomes, therefore, a very narrow inquiry, where the escheat shall go.

It would seem to be an obvious answer, that it must go where the law directs. Tenures and their incidents and the rules of inheritance are all the creatures of law, and except as to rights already vested, may be changed and modified at pleasure. And it was for the law-making power, that could control lands and their enjoyment in Michigan, to direct where lands should go for default of heirs, as it was to direct who should be regarded as heirs at all. For there is no such thing as a natural line of inheritance independent of the law.—*2 Bl. Com., 11 ; Bacon's Maxims of the Law, Rule 11.*

If Congress had seen fit to provide for such cases, we think it had power to do so. We are not prepared to question its authority on any theoretical grounds arising out

of the conditions of cession; although those conditions are significant in construing the Ordinance. This region was acquired by treaty, and did not come into the actual possession of the United States until after the Constitution was adopted, and it was held in *U. S. v. Repentigny* that the United States succeeded directly to the rights of the French and British governments, which had complete supremacy. But the Articles of Confederation made no provision for the direct legislation of Congress over the local affairs of any part of the country, and such direct government, while possibly it might have been lawful, would have been at variance with the whole theory of local government, which had been acted upon both by States and colonies. The delegation of legislative powers to the Territories was practically a necessity, and the Ordinance of 1787, while retaining a right of veto or disapproval of the acts of the Governor and Judges, provides expressly that such laws as are not disapproved shall only be repealed by the local authority. No one can read the Ordinance without perceiving that it was intended to throw the whole regulation of local affairs upon the local government. The public lands were not to be interfered with till they had been severed from the public domain by primary disposal. But when they had become private property, they came, like all private rights, under local regulation.—*Carroll v. Safford, 3 How. R., 441.*

Immediately after the government of the United States was organized under the Constitution, a brief statute was passed to adapt the Ordinance to the Constitution;—not to change its nature,—but, as stated in the preamble, in order that it "*may continue to have full effect.*" And so long as the system should continue, the whole local regulation was clearly delegated to the Territory, as it was afterwards to Michigan when separately organized.

Even under the old common law notions the creation of such a government would be at the least an equivalent to the erection of a county palatine, and would transfer all necessary sovereign prerogatives.   But under this ordinance the Territory only differed from a State in holding derivative instead of independent functions, and in being subject to such changes as Congress might adopt.   But, until revoked or annulled, an act of the Territory was just as obligatory as an act of Congress, and for the same reasons.

The Ordinance of 1787 undertook to regulate the law of descents to a certain extent, but did not exhaust the subject.   It adopted neither the common nor the civil law rule entire.   It varied from the common law in abolishing primogeniture, and in putting females on the same. footing of heirship with males, and in not distinguishing between kindred of the whole and of the half blood.   It was defect-'ive also in not declaring, beyond a certain point, when heirs should take *per stirpes*, and when *per capita*, and in not directing by which law the collateral kindred and next of kin should be ascertained.   As there was no common law of the United States to supply these defects, further supplementary legislation was necessary.   The Ordinance also was silent concerning failure of heirs and its consequence, and the common law of England was entirely inapplicable to many cases, even if it could then be regarded as in force, as it certainly was not in Michigan.   Accordingly the Ordinance, in providing this imperfect rule of descents, declared that it should be operative until *altered by the Legislature of the district*.

It was argued on the hearing, that this legislature meant the popular assembly provided for in the distant future, and not the legislative board of Governor and Judges, authorized to adopt laws in the first instance.   We do not think it would change the case at all if this should be the

construction, for it would still be competent to supply the defects of the Ordinance, and to cover what it had omitted, and if there had been no new legislation, the failure of heirs must of necessity—in the absence of any statute—bring the land within the regulation of the Territory. Congress never legislated upon the subject, and there has never been an instance of an escheat claimed to have accrued to the United States since they came into existence. In the *Repentigny* case the forfeiture occurred before the country came into the hands of the British government, and was therefore a part of the domain acquired by treaty; and the Supreme Court declared that, by the treaty, our government succeeded to the rights of its foreign predecessors. When resort is had to *office-found,*—a subject which will be referred to presently,—that process is not in that class of cases the origin of the title, but it relates back to the forfeiture. In that case there was no office-found, beyond a legislative disposal.

There are parts of the Ordinance providing for the distribution of taxes, and prohibiting interference with the public lands, where the term "Legislature of the district" must include the Governor and Judges. And this was the practical construction from the beginning. The law of descents and intestacies as adopted by that body was never disapproved by Congress, and has been regarded from its date as the law of the Territory. It is too late now to raise any such question. But in regard to escheats the Ordinance was entirely silent, and the act passed October 1, 1818, declaring that they should "*accrue to the Territory,*" was not in conflict with the Ordinance. The succession act April 12, 1827, was in this respect identical. The act of Congress, of June 15, 1836, preliminary to the admission of the State into the Union, accepts, ratifies, and confirms the Constitution; and the Constitution (*Schedule, section 3*)

provides that "all fines, penalties, forfeitures, and *escheats* accruing to the Territory of Michigan, shall accrue to the use of the State." We think the State of Michigan became thereby entitled to the premises in controversy.

The next question presented is whether the title is affected by lapse of time. The first act of limitations made to operate against the State, was passed in 1846, and took effect March 1, 1847.—*R. S. 1846, 600.* The statute does purport to be retrospective, and the general saving clause provides that all actions and rights concerning land shall be governed by the statutes in force when they accrued. Section 9. This has always been our policy, and the fact that the sections are not in regular order, and that Section 9 precedes the State limitation, cannot affect its operation, for Section 9 qualifies the whole chapter. The reason why limitations against the State should not operate without express statute, is vindicated in *Lindsey v. Miller's lessees, 6 Pet., 666,* where it is said that otherwise "the public domain would soon be appropriated by adventurers. Indeed, it would be utterly impracticable, by the use of any power within the reach of the government, to prevent this result." And the difficulties of such a case as the present, show the propriety of adhering to the rule, for the Territory was very thinly settled, and even now the State has no officers who have authority or facilities to make such investigations as would enable them in such a case as this to ascertain, without much difficulty, whether Edwin Reeder was rightly or wrongfully in possession. The doctrine of presumption of title from ancient grant is quite as inadmissible. If such a presumption can ever be allowed to dispute the accuracy of the public acts and records, it cannot be permitted when there is in the case positive and unquestioned evidence showing that no title existed or was ever set up on behalf of Reeder beyond his

assumption of possession. The claim is inapplicable to the facts.

It remains to be considered whether the right of the State could be transferred to the plaintiff before proceedings in the nature of office found. The doctrine relied upon is supposed to have required this as a preliminary to obtaining a right of entry, and an actual or constructive entry was by the common law very generally required to complete the operation of a title. The doctrine is briefly stated by *Comyn Dig.*, "*Prærogative,*" D. 6, as follows: " In all cases when a subject shall not have possession in deed or in law, without entry, the king will not be entitled without office found, or other matter of record." The examples given are all cases of forfeiture. And in title headed " Prærogative," D. 70, "*when an office is not necessary,*" it appears very clearly that it never was necessary in such cases as this. "If a possession in law be cast upon the king, no office is necessary, but the king may seize without it; as if the king has a title by descent in remainder, or reverter; for the freehold is cast upon the king by law. *Stamf. Praer. R. 54 a ; 4 Co. 58, or is entitled by escheat.*" And under " Prærogative," D. 71, it is said that it shall be an intrusion in a man " if he enters upon a possession cast upon the king by descent, *escheat, etc.,* before entry by the king;" and that " An intruder upon the king does not gain any free hold in the land." And " at common law, upon an information of intrusion, the king by his prærogative might put the defendant upon showing his title specially." *D. 74.*

There was an obvious propriety in requiring some preliminary ascertainment of the fact, in all cases where the escheat is from a forfeiture for misconduct, or for breach of conditions. But where the estate devolves upon the government in a natural way by what is in fact only a

canon of inheritance, there could be no sound reason for holding such a proceeding necessary. And accordingly it was never necessary when the freehold came to the king directly by act of law and not by reason of the act of the party. Upon this there is no conflict or uncertainty among the authorities. Thus in *Brooke's Abridgement:* " *Office devant eschetour*," *34*, it is said " That in divers cases the king shall be seized without office, as when the king's tenant dies without heir, or if a man be attainted of treason, or if the king's tenant grants in tail and the donee dies without issue; and the same law when the king grants land for a term of life and the lessee dies, for freehold cannot be in suspense. *Contra* of alienation in mortmain or alienation by the king's tenant without license. And it seems that an entry by a stranger in the former case does not alter the case, for if the king is seized by the law without office, a stranger by his entry cannot divest the freehold out of the king; but *quære* if the king's grant be good in such cases without office, because *by statute 18, H. 6., Cap. 6*, grant before office shall be void." So Lord Hale, referring to the distinctions created by statute in regard to forfeiture of entailed estates for treason, says that until the 33 H. 8., which vests all in the king without office, if tenant in tail had been attainted of treason, and died in that interval, the land would have descended to his son till office found; but otherwise in case of tenant in fee simple attainted and dying without office, the freehold is cast upon the king without office, because none could take it else. *1 Hale P. C., 242*. And since office found had been required by statute for certain purposes, the distinction has always been recognized between those cases where it gives title, and those where it is merely for information of title already passed. In the one case the king was entitled to the mesne profits after

the escheat, while in the other he was not. *Tomlyn Dic.,* "*Office Found;*" *Com. Dig.,* "*Prærogative. D. 68.*" For in case of forfeiture, properly so called, the forfeiture was not complete before seizure. *1 T. R., 252; 3 T. R., 730, 734.*

If during the life of an alien it is sought to divest him of the freehold, it can only be done by legal proceedings, but upon his death, not having any heirs, the freehold at once vests in the king. *Co. L., 2 b.; Com. Dig.,* "*Alien,*" *C. 2, C. 4.*

The freehold must always vest somewhere, and it is on this account that the authorities uniformly hold that whenever there is a defect of heirs, the title passes at once. This rule is clearly stated in *Mooers v. White, 6 J. C. R., 360; Slater v. Nason, 15 Pick., 345, 349; Fairfax v. Hunter's lessee, 7 Cr., 603; Montgomery v. Dorion, 7 N. H., 475; Rubeck v. Gardner, 7 Watts, 455; O'Hanlin v. Den., Spencer, 20 N. J., 31, 21 N. J., 582.*

If, then, the title of the State did not pass to the plaintiff, it was not because it was imperfect or inchoate, but for some other reason. And it is claimed that grants of land, out of possession and not actually seized into the custody of the State, are void at common law, as against public policy. The cases cited to sustain this proposition find nothing in the common law to maintain them. It was only by statute that such grants were forbidden. The king "may grant lands which come to him by descent or escheat before office found; for the freehold is cast upon him by law."—*Com. Dig.,* "*Grant, G. 1.*" "So if lands forfeited for treason are vested in the king by the *Statute 33, H. 8,* or any particular statute, the king may grant them before office found, notwithstanding the statute *18 H. 6, 6, 2 Rol. 184 l. 40.*"—*Id.* And while at common law the right of entry against one in by adverse title did not escheat for treason, yet a right of entry against a mere disseisor or abator did,

and although an inquisition or seizure was necessary in such case to put the king in actual possession, yet it appears that in spite of the statute *18 H. 6, 6,* he could grant the right before such seizure; only in making such a grant it must have been special, not of the land, simply, but of the right to the land, otherwise neither land nor the right of entry passeth.—*1 Hale P. C., 243,* citing *Dowty's case 3 Co. R., 10 b.*

The English statutes were repealed entirely by the Governor and Judges in 1810. They arose out of a state of things which never existed in this country, and in connection with doctrines concerning titles to land which were entirely inapplicable to any but a densely settled region, and a system of feudal tenures. Immediately after the Conquest the whole realm of England was so thoroughly surveyed by the orders of William, for the purpose of ascertaining the tenures of lands and their occupants, and every estate was noted in Domesday Book, with all matters concerning it. As the Saxon Chronicle declares: "So diligently did he direct the land to be surveyed, that there should not be a single hyde or perch of land, nor an ox or cow or hog, passed over which should not be brought into the census." *1 Rec. Com. Rep., 384.* Escheators were appointed annually in every county to make inquests of titles by escheat, and it would have been practically almost impossible for an estate to lapse without discovery. There were few vacant lands, and the owners were in possession in many, if not most cases by tenants, whom it would have been a hardship to disturb without some showing. And the nature of the tenures led to a policy disfavoring any dealing with titles by those out of possession. Accordingly an entry was usually necessary to enable the owner to deal with his property. And where land was held adversely the same policy avoided any conveyance of it by the party out of

21 MICH.—K.

possession. The whole system is a relic of feudalism, and while there may be some foundation for such a policy in order to prevent litigation, that is not the legal basis of it·

But, be this as it may, there was no such obstacle at common law to the operation of a royal grant of escheated lands. Nor, under the statutes of this State, can there be room for any such doctrine. Under the law regulating the action of right, in force when both Harvey and Mrs. Reeder died, it was provided expressly that actual entry should "not be necessary to have and maintain the action of right, or any other action to recover the title or possession of land;" and "that actual livery of seizin, nor any particular words, symbols, forms, or ceremonies, indicative thereof, shall not, in any case or proceeding, be requisite."—*L. 1821, p. 385.* In a country where nine-tenths of the lands were unoccupied and owned by non-residents, and where it was a very easy thing to take wrongful possession without detection, the rule requiring entry was as inapplicable as the ancient remedy, by battle or by grand assize, and the attendance of four knights girt with swords,—all of which antiquities were dispensed with by this same statute.

The case of *Bruckner's Lessee v. Lawrence, 1 Doug. R., 19,* laid it down as common law that land held adversely could not be lawfully conveyed. The decision did not strike the profession very favorably, and in the subsequent case of *Stockton v. Williams, 1 Doug. R., 546,* it was practically nullified, by holding that the deed was good by way of estoppel, and that the grantee could sue in the grantor's name to recover the land. The attention of the Legislature being called to the matter, a provision was inserted in the revision then under discussion, whereby the whole doctrine was swept away.—*R. S., 1846, p. 263,* § 7.

We think, therefore, that there is no foundation for the claim that the land was not lawfully granted by the trustees.

It is not very important to spend much time in discussing the points of evidence raised. As against a mere intruder, without color of right, the English rule at common law seems to have allowed the Government, upon information of intrusion, to require him to disclose and plead his title, as a corporation is called upon to set up its franchises on an information for usurpation. But the theory of our action of ejectment seems to require the plaintiff to make out a *prima facie* title before the defendant can be compelled to answer it. In cases of escheat, however, the proof cannot be required any more than in other cases, to exhaust all the possibilities. Death of the tenant and no appearance of the persons claiming as heirs-at-law, was held, in *The People v. Fulton Fire Ins. Co., 25 Wend., 205,* to be sufficient to put the defendant to his proofs. In cases like the present, where aliens were disqualified, proof of the alienage, and of the American marriage and death without issue, was enough, because no heirs were possible on that hypothesis.

The same remark will apply to Eliza Reeder's statements. The persons referred to could not have inherited, and the evidence could not be received to affect the plaintiff's case. But we also think it was inadmissible under any circumstances, until persons were shown to be in existence who could be connected, by the declarations, with the deceased. While hearsay is admissible for many purposes connected with pedigree, there is no authority holding that the existence of living persons can be proved by it, still less that it can be received to prove such existence when it furnishes no means of finding or identifying them. Even if persons were known to have been in existence in 1827, that presumption would not exist now without more recent proof.— *3 Phil. Ev. (Edwd.'s Ed.), 598.*

The novelty of the questions involved has induced us to discuss them more at length than we should have felt justified in doing under any other circumstances, as the rights of the parties are not involved in any other difficulty than what was supposed to have arisen out of a state of law which is not applicable to our land system.

Judgment must be reversed and a new trial granted.

The other Justices concurred.