BROWN, RUSSELL & RUSSELL *vs.* SPRAGUE.

The 6th article of the treaty of 1783 not only barred the escheat of lands held by British subjects in this state, but gave them capacity to transmit them by descent; but the descent must be to a citizen.

Where a British subject holding lands here died previous to the treaty of 1794, leaving no citizen heirs, his land escheated, and the provisions of the treaty did not pass the lands to alien heirs.

The act of 1845, (*Laws* 1845, *p.* 94,) does not operate to confirm a title previously conveyed by an alien heir of one holding real estate.

Where several ejectments were pending between one claiming title and persons having only the naked possession of lands, and an agreement was made between all the parties that the suits should be stayed and await the event of a suit between other parties in which the same questions arose, held that a judgment in that suit would operate as an estoppel between the parties to the agreement; and this, although the judgment was one as in case of nonsuit.

EJECTMENT for lots 3 and 15 in Legge's patent, Essex county. The cause was tried at the Essex circuit, in June, 1845, before the Hon. JOHN WILLARD, circuit judge.

In 1769, letters patent were issued granting to Francis Legge, a captain in the British army, 5000 acres of land, known as Legge's Patent. He died near Albany in 1788 or 1789, intestate, and leaving a nephew, John Legge, and a niece, Catharine Legge, his only heirs. They resided in Ireland, and, as well as the patentee, were British subjects. In 1820, John and Catharine Legge conveyed the whole patent to the plaintiff Brown in fee. Shortly after this, Brown came to the patent,

produced his deed and claimed the land. Previous to this, however, some person claiming to hold the land adversely to the title from Legge, had divided the patent into 36 lots. When Brown came on, he leased 22 or 23 of the 36 lots, and com menced ejectment suits against the persons occupying the re maining ones. At this time none of the occupants claimed any more than a naked possession, and they gave it as the only reason for not taking title under Brown, that they doubted the validity of his title. While these suits were pending, another ejectment suit was brought by one Shaw against Hiram Spear, which involved the validity of Brown's title. An agreement was then entered into between Brown and the defendants in the ejectment suits brought by him, that he should stay those suits until the result of the suit brought by Shaw against Spear, and that they should abide the event of that suit ; and in case judgment should be rendered for Spear, then the defendants should quit possession of the lots they occupied, or purchase them of Brown at a fair valuation, and each party should pay his own costs : if judgment should be rendered against Spear, then the suits brought by Brown should be discontinued. Immediately on the execution of the agreement, Brown suspended all proceedings in the suits brought by him, and defended the suit of Shaw against Spear, and obtained a judgment as in case of nonsuit in favor of Spear in 1843. At the time the agreement was made, Thomas J. O. Curtiss occupied lots 3 and 15, and was one of the defendants against whom the actions of ejectment were pending who signed the agreement. He continued from that time in possession of the land without any claim of title, until four or five years before the trial of this action, when he sold his possession to Foot & Stevens, who again sold it to Sprague, the defendant, who held it at the time this action was commenced.

In 1826, Brown conveyed to the plaintiff, Solomon Russell, an undivided half of the patent, which the latter, in 1843, conveyed to the plaintiff David Russell, and about the same time Brown conveyed to David Russell the other undivided half.

The foregoing facts having been proved, the defendant's counsel moved for a nonsuit on the following grounds:

1st. That the heirs of Francis Legge, the patentee, from whom the plaintiffs derived their title, were aliens residing in Ireland at the time of his death in 1788 or 1789, and therefore could not take lands by descent: that the treaty of peace of 1783 did not provide that lands owned by British subjects in the United States at the time of the revolution should descend to alien heirs: that the patentee having died before the treaty of 1794, his heirs were not protected by that, and being aliens could not inherit; and consequently the lands had escheated and become the property of the state, and therefore the deeds from John and Catharine Legge conveyed no title to the plaintiffs.

2d. That there had not been such a possession by Brown under the conveyances from the heirs of the patentee as would give effect to his title and enable him to enforce it in an action at law.

3d. That the agreement between Brown and Curtiss, the occupant of the premises in question, was not such an one as would create the relation of landlord and tenant, or as would deprive him or those claiming under him of a right to set up a title paramount to Brown's, although he had performed the agreement on his part.

Each of which positions the circuit judge decided to be well taken, and he thereupon ordered a nonsuit. The plaintiff excepted to every portion of the decision, and upon a bill of exceptions moved to set aside the nonsuit.

*S. Stevens,* for plaintiffs, insisted 1st, that the plaintiffs had shown a valid title to the premises claimed. The 6th article of the treaty of peace secured to the patentee, although an alien, the full title to the patent, with all its incidents, and enabled him to transmit it by descent to his alien heirs. (*Orr v. Hodgson,* 4 *Wheat.* 462, 3; *Gospel Propagation Society* v. *New-Haven,* 8 *id.* 485; *Orser* v. *Hoag,* 3 *Hill,* 84.) The heirs having derived title by descent in 1789, it was secured to them

by the 9th article of the treaty of 1794. Moreover, Francis Legge being a resident alien at the time of his death, his heirs at law were, by the act of 1845, (*Laws* 1845, *p.* 95, § 4 ; *and p.* 96, § 9,) enabled to inherit, notwithstanding their alienage, and the descent to them and their conveyance to Brown is by its provisions confirmed. 2d. That the defendant, by force of the agreement between Brown and Curtiss, was precluded from disputing Brown's title.

*H. Denio,* for the defendant. 1. The title of Francis Legge upon his death escheated. The law gives no estate which it does not enable the donee to keep ; and hence, although an alien may take by purchase real estate, and hold it until office found, he cannot take by descent. (2 *Kent's Com.* 53, 61.) And where an estate escheats for want of heirs, it vests in the state without inquest of office. (*People* v. *Conklin,* 2 *Hill,* 69, 70.) The 6th article of the treaty of peace conferred no capacity to take by descent upon Francis Legge's alien heirs. It provides only for the case of forfeitures for incapacity of the owner to hold, and does not touch the case of an escheat for want of heirs capable to take. The 9th article of the treaty of 1794 operated only on existing titles. John and Catharine Legge then had no title. Upon the death of Francis his title vested in the state. (*Harden* v. *Fisher,* 1 *Wheat.* 300; *Blight's Lessee* v. *Rochester,* 7 *id.* 535.) 2. The statute of 1845 (*pp.* 95, 96, §§ 4, 9,) has no application to the case. Francis Legge was not, when he received his title, " an alien resident of this state," but a British subject residing in a British colony. He was not therefore within the provisions of the 4th section of the act. But if it were applicable, it would not aid the plaintiff. It would vest the title in John and Catharine Legge, and not in their grantees, as there is no evidence of their warranting it. The 9th section was intended to aid the grantee of an alien who had a voidable title—good until office found—but not the grantee of an alien who never had a title. Confirmation can aid a *voidable* title, but never can confer an estate or aid a void title. (*Cases cited in Smith* v. *Saratoga Mutual Ins. Co.* 3

*Hill*, 511.) 3. The agreement between Brown and Curtiss vested no title in Brown, and does not entitle the plaintiffs to . recover. It cannot be enforced by ejectment. If it has any validity, it should have been enforced by motion for judgment in the suit between Brown and Curtiss according to its terms, or by bill in equity for specific performance. If either of these methods of enforcing it were resorted to, the defendant might have set up an equitable defence. But the object of the stipulation failed when those prosecuting the suit against Spear suffered judgment as in case of nonsuit without a trial on the merits. This would have been a good defence to a bill seeking a specific performance of the agreement, or even ground for cancelling it. (*Quick* v. *Stuyvesant*, 2 *Paige*, 84, 92. Another equitable defence would have been Brown's want of title. In any view of it, the agreement cannot estop the defendant from setting up Brown's want of title, for neither defendant nor Curtiss his grantor entered under Brown, but were in possession before ; and an agreement to purchase land of one provided he establishes the fact that he is its owner, is not such a recognition of title as amounts to an estoppel.

*By the Court*, BEARDSLEY, Ch. J. The patentee, Francis Legge, acquired title to the land in suit in 1769, and retained it until his death in 1788 or 89. He was never a citizen of this state, but remained a subject of the British crown to the close of his life. It is not necessary to inquire whether the people of this state could have divested his title on the ground of alienage, (*Jackson* v. *Lunn*, 3 *John. Cas.* 109; *Blight's Lessee* v. *Rochester*, 7 *Wheat.* 535,) for no such attempt was ever made ; and the objection, if at any time available against him, was obviated by the *sixth* article of the treaty of peace of 1783. (*Jackson* v. *Lunn*, *supra* ; *Orr* v. *Hodgson*, 4 *Wheat.* 453 ; *Society, &c.* v. *New Haven*, 8 *id.* 484 ; *Orser* v. *Hoag*, 3 *Hill*, 84.) The effect of this article, as these authorities show, was not only to bar the escheat of land held by British subjects, but to give them a capacity to transmit the same by descent. Such descent, however, must be as in ordinary cases to a citizen, not

an alien, although there may be an exception to this principle where the land was owned by a subject of the British crown at the commencement of the revolutionary war, and the alien, claiming to take as heir, was then in life. (*Jackson* v. *Lunn, supra; Kelly* v. *Harrison,* 2 *John. Cas.* 29.) But this exception, if well founded, is inapplicable to the present case; for it does not appear that the nephew and niece of the patentee, who claimed as his heirs, were born as early as the 4th of July, 1776. The patentee, although an alien, had a capacity to transmit title to this land by descent, but his nephew and niece were incapable of acquiring title in that manner on account of their alienage. No right or title to this land passed to them on the decease of their uncle, and their deed to Brown gave him no interest whatever in the premises.

The treaty of 1794 has no possible bearing on this case, for the plain reason that title to the land was not then vested in any British subject. That treaty (article 9) applied only to titles then existing in such subjects, (*Blight's Lessee* v. *Rochester, supra,*) which was not the fact with regard to this land. The patentee had then been dead several years, and upon the papers before us it cannot be pretended with any show of plausibility, that the title to these lots was then vested in any subject of the British crown. That treaty therefore has no application to the case in judgment.

It was urged by counsel on the argument that a law of this state, enacted in 1845, gave to the nephew and niece of the patentee a capacity to take this land by descent; and I admit that if they were living when the act was passed, such may have been its effect. (*Laws of* 1845, *p.* 95, § 4.) But this construction of the act, if correct, will not aid the plaintiffs, whose alleged title is founded on a deed executed by the nephew and niece in 1820. When the patentee died, which was in 1788 or 89, they were incapable of taking title from him as his heirs, nor had they any such capacity when the deed referred to was executed. Grant that by this act of 1845 they were "made capable of taking," and that they did thereupon take as heirs of the deceased patentee, this can have no effect upon the case in

hand. If they thus acquired title in 1845, it will not follow that their deed, executed twenty-five years previous to that time, transferred such title to Brown, the grantee in that deed. The deed is not shown to have contained covenants of any sort, and could only operate upon such right as the grantors had when it was executed. As far as appears they had none whatever at that time, and if they acquired title in virtue of the act of 1845, there is nothing to show that they have since parted with it. We were referred to the *ninth* section of this act, which it was contended made the deed of 1820 effective as a conveyance of whatever title vested in the grantors in virtue of the provisions of that act. But we think the section has no such effect. It may make grants theretofore executed by aliens, as effective as if made by citizens, but it does not assume to give them any greater effect or operation. It does not in terms or spirit, assume to make a quit-claim deed executed in 1820, effective to convey a title which first vested in the grantors in 1845. The alleged paper title of these plaintiffs cannot, therefore, be in any view sustained.

There is another ground, however, on which, I think the plaintiffs, or some of them, and in the present posture of the question it is immaterial which, were entitled *to recover*. The defendant holds as tenant to Foote & Stevens who about 1841, purchased the *possession*, as the bill of exceptions states, of Thomas J. O. Curtiss, who had been in possession from a period as early, at least, as 1826, although he, at no time, claimed to have any title to the land. In 1826, an action of ejectment for the recovery of these lots was pending in favor of Brown, one of the present plaintiffs, against Curtiss, but which was then stopped and ultimately abandoned, in consequence of an agreement entered into by them. By that agreement it was stipulated that the action against Curtiss should abide the result of another action of ejectment then pending against one Spear, and which, as is stated in the agreement, involved the validity of the title of Brown; it being expressly declared by said agreement that if judgment, in the suit against Spear, should be rendered in his favor, Curtiss should quit possession

of said land or purchase the same of Brown at a fair valuation: and if judgment should be rendered against Spear, the said Brown was to discontinue his suit against Curtiss. On making this arrangement Brown stayed all proceedings in his suit against Curtiss, and defended, at his own cost and expense, the suit against Spear, in which judgment as in case of nonsuit was rendered in his favor in 1843. It was not pretended on the argument, nor, as far as can be collected from the bill of exceptions, on the trial of the present cause, that the agreement of 1826 was founded on any thing like fraud, misrepresentation or mistake, or that it was any thing but a fair and voluntary arrangement between the parties thereto, and such as they deemed for their mutual benefit and advantage. This being its character it should be faithfully observed by the parties, and it is the duty of the court to carry it into full effect according to its terms and spirit. It was in substance an agreement, that in a certain event, to wit, the rendition of judgment in favor of Spear in the action pending against him, Curtiss would purchase the two lots of land then in his possession, and which are now in suit, of Brown, or would give up possession to him. The contingent event upon which this agreement then depended, has since occurred, and Curtiss thereby became bound absolutely, to make the purchase or surrender possession of the premises. He did neither, having previously sold his possession to Foote & Stevens, under whom the defendant entered and held for them and in their right, whatever it was. Neither Curtiss, Foote, Stevens, or the defendant, has at any time claimed title to the land, nor, on the trial, did the defendant set up or offer to show title in any third person. The possession of Curtiss was confessedly without title, and Foote & Stevens purchased but his bare possession. They stand in the place of Curtiss, and have such right only as he had. If Curtiss had remained in possession he would now be bound to surrender it to Brown, for such was the agreement entered into ; and the defendant, who represents his lessors, Foote & Stevens, is as much bound by that agreement as Curtiss himself. The agreement certainly did not create the technical relation of

landlord and tenant, but, being an agreement to purchase the land or surrender possession to Brown, it estops Curtiss and all persons standing in his place and stead, from controverting Brown's right to the possession. (*Jackson* v. *Ayers,* 14 *John.* 224; *Jackson* v. *Walker,* 7 *Cowen,* 637.) If the contract had been procured by fraud, imposition or mistake on the part of Curtiss, it might not have bound him. (*Jackson* v. *Spear,* 7 *Wend.* 401.) But nothing of this nature was shown, nor did Curtiss, or those who succeeded him, make any pretence of title or right to the land. Under such circumstances they cannot be allowed to question Brown's right to the possession. As far as appears, he abided fairly by the agreement with Curtiss, and the event by which that agreement was to become absolute having occurred, Brown is entitled to the stipulated benefit. That benefit was a purchase of the land of him, or a relinquishment of the possession to him. But the purchase was not made, nor was the possession yielded; this suit was, therefore, properly brought to gain possession of the land.

The judgment rendered in favor of Spear being as in case *of nonsuit and not on the merits,* it was urged on the argument that this was not such a judgment as was contemplated by the agreement between Brown and Curtiss. We think otherwise. Spear was defendant in the action referred to in the agreement, and he could in no way compel the plaintiff therein to bring his cause to a determination on the merits, for he might at any time abandon the action. According to the agreement, the sufficiency of Spear's defence depended on the validity of the title of Brown, and if the plaintiff in that suit would not try his cause on the merits, the defendant therein could in no way compel him to do so. Curtiss had agreed to abide the result of that cause, without requiring it to be determined on the merits. He may have supposed that it would be so tried and disposed of, but he did not make that a condition in his agreement with Brown. All he insisted upon was, that judgment should be rendered in favor of Spear, in which event, no matter whether the judgment was by default or on the merits, he agreed to surrender possession, unless he chose to purchase the land of

Brown. Curtiss, therefore, if he desired to have the cause against Spear tried and determined on the merits, was bound to see that it was só prosecuted as to require a decision of that description. That, so far as is material to this agreement, was his concern, not Brown's. The agreement is explicit, that if judgment was rendered in favor of Spear, Curtiss would either purchase or surrender possession to Brown. Such a judgment was rendered, and Curtiss should abide by his engagement. The land has not been purchased, and Brown's right to the possession cannot now be questioned by the defendant, or by any one else holding under Curtiss. There should be a new trial.

Ordered accordingly.