BANK OF COMMERCE v. CITY OF LOUISVILLE.

SAME v. STONE et al.

(Circuit Court, D. Kentucky. June 4, 1898.)

Nos. 6,568 and 6,567.

1. ATTORNEY AND CLIENT—POWERS OF CITY ATTORNEY—AGREEMENT TO ABIDE BY JUDGMENT IN TEST CASE.

A city attorney charged with the duty of managing all the city's litigation may bind the city, in a number of controversies, to abide by the result of a test case to be brought involving the same questions.

**2. RES JUDICATA.**

A bank which agrees, by its attorney, with the attorney of a city, that a suit to be brought by it against the city shall abide the result of the judgment to be entered in a test case involving the same questions, may claim the benefit of the estoppel of the judgment which is subsequently rendered against the city in the test case.

Heard on demurrer to the bill and motion for preliminary injunction.

The Bank of Commerce is a state bank of Kentucky, organized under a statute of that state approved February 3, 1865. It is situated in Louisville, and when the Hewitt act was passed, to amend the revenue laws of the commonwealth of Kentucky, May 17, 1886, it duly accepted the terms of that act before the meeting of the next legislature of Kentucky. One of the grounds relied upon in the bill was that of res judicata. The averments of the bill upon this point were contained in paragraphs 4 and 5 of the bill, as follows:

Paragraph 4. Your orator shows that early in the year 1894, and before the 4th of May, 1894, the defendant the city of Louisville, claiming to act under the authority of the statute governing cities of the first class, and of its ordinances adopted in pursuance thereof, demanded of your orator, and of every other bank and trust company in the city of Louisville, a tax equal to 4 per cent. of its gross receipts; and, this demand being refused, legal proceedings were commenced in the city court of Louisville, in behalf of the city, against all of said banks and trust companies, including your orator. At that date the tax upon the gross receipts of the banks, if enforceable, was payable to the sinking fund of the city of Louisville; and, with a view of embarrassing the sinking fund of the city as little as possible, the banks, through their committee, held a meeting with the commissioners of the sinking fund; and it was agreed between the city of Louisville and its sinking fund commissioners, upon the one part, and the banks and trust companies of the city of Louisville, including your orator, upon the other, that pending the litigation which, by the agreement, was to be inaugurated, and without prejudice to the right of the banks they would make payments and loans to said sinking fund, as follows: First. The sinking fund was to accept from each of said banks and trust companies a payment equal to the difference between the amount which the banks and trust companies would have to pay to the state under the present law and the amount which they would be required to pay for state taxes under the provisions of the Hewitt bill. This sum, it was provided, should be an actual payment, and not be repaid under any circumstances; but its payment was not in any manner or to any extent to prejudice the banks or trust companies paying it, or to be taken as a waiver of any legal right which they might have in the premises. Second. In addition to making the above payments, the banks and trust companies, save those which were to be selected to test the question involved, should each lend to the sinking fund a sum which, added to said payment, would equal 4 per centum of its gross earnings during the year 1893; and the sinking fund would execute for said loans its obligations, agreeing to repay the same with interest at 4 per centum per annum; and if it should be finally adjudged by the court of last resort that said banks or trust companies were not liable to pay the license fee required by the ordinance aforesaid, but if it should be finally adjudged that they were liable to pay said license fee, then said loan should be taken and deemed as a payment of said license fee, and the obligation to repay same should be void. Third. It was agreed that the banks or companies selected to test the questions involved would each lend the sinking fund a sum equal to 4 per centum of the gross earnings for the year 1893, and would receive therefor the obligations of the sinking fund, as above described. Fourth. It was further agreed that that arrangement was entered into with the understanding that the banks and companies would institute without delay, and

diligently prosecute, such action as might be necessary to settle and adjudge the right and liabilities of the parties in the premises, and pending such proceedings the sinking fund would not prosecute them, or any of them, for doing business without license. The substance of this agreement was spread at large upon the records of the sinking fund, and a copy thereof is filed herewith as part hereof, marked "A."

The Exhibit A referred to is as follows:

Sinking Fund Office, February 13, 1894.

A committee, consisting of Messrs. Thomas L. Barrett, John H. Leathers, and George W. Swearingen, appeared before the board on behalf of the banks, who are members of the Louisville Clearing House, and stated that it was the purpose of said banks to resist the payment of the license fee demanded of them under the license ordinance approved January 29, 1894, on the ground that said banks were not legally liable to pay the same; but, in order to save the sinking fund from any embarrassment occasioned by their refusal to pay said license fee, the banks, with two or three exceptions, were willing to enter into an arrangement, whereby they would pay a part of the amount demanded of them, and lend the sinking fund the balance thereof, to be repaid, with interest at four per centum per annum, if it was finally decided and adjudged that the banks were not liable to pay said license fees. After discussion, the president was, on motion of Mr. Tyler, seconded by Mr. Summers, authorized to enter into the following arrangement with the different banks, trust and title companies who will be subject to the payment of the license fees if the license ordinance is finally adjudged to be valid and enforceable: First. To accept from each of said banks and companies a payment equal to the difference between the amount they now pay to the state for state taxes and the amount they would be required to pay for state taxes under the provisions of what is known as the "Hewitt Bill." This sum shall be an actual payment, not to be repaid under any circumstances, but its payment shall not in any manner or to any extent prejudice the banks or companies paying it, or be taken as a waiver of any legal right which they have in the premises. Second. In addition to making the above payments, the said banks and companies, save those selected to test the question involved, shall each lend the sinking fund a sum which, added to said payment, will equal 4 per centum of its gross earnings during the year 1893, and the sinking fund will execute for said loans its obligations agreeing to repay the same, with interest at four per centum per annum, when and if it shall be finally adjudged by the court of last resort that said banks or companies are not liable to pay the license fee required by the ordinance aforesaid; but, if it is finally adjudged that they are liable to pay said license fee, then the said loan shall be taken and deemed as a payment of said license fee, and the obligation to repay the same shall be void. Third. The banks or companies selected to test the questions involved will each lend the sinking fund a sum equal to four per centum of their gross earnings for the year 1893, and will receive therefor the obligations of the sinking fund as above described. Fourth. This agreement is to be entered into with the understanding that the said banks and companies will institute without delay, and diligently prosecute, such actions as may be necessary to settle and adjudge the right and liabilities of the parties in the premises, and pending such proceedings the sinking fund will not prosecute them, or any of them, for doing business without license.

A true copy. Attest: J. M. Terry, Secretary and Treasurer.

Stipulation between the city of Louisville, the commissioners of the sinking fund of the city of Louisville, and the banks, trust and title companies of the city of Louisville:

It is agreed between the city of Louisville, the commissioners of the sinking fund of the city of Louisville, represented by H. S. Barker, city attorney, acting under the advice and by the authority of the board of sinking fund commissioners, given at a regular meeting of said board and the mayor of the city of Louisville, on one part, and the various banks, trust and title

companies of the city of Louisville, acting by Humphrey & Davie and Helm & Bruce, their attorneys, of the other part—First. That in February, 1894, it was agreed between the city of Louisville and the board of sinking fund commissioners, acting together in the interest of the said city, and the various banks, trust and title companies, acting through their committee, to wit, Messrs. Thomas L. Barrett, John H. Leathers, and George W. Swearingen, and their counsel, to wit, Messrs. Humphrey & Davie and Helm & Bruce, that the question of the liability of said banks and trust and title companies to pay municipal taxes, either license or ad valorem, otherwise than as provided by the revenue law, commonly known as the "Hewitt Bill," should be tested by appropriate litigation looking to that end. Second. In order to effectually test the question as to all of said companies, they were divided into three classes, it being understood that all who had accepted the provisions of the said Hewitt bill would fall in one or the other of the classes named, to wit: (A) Banks whose charters had been granted prior to 1856; (B) banks whose charters had been granted subsequent to 1856; (C) national banks,—it being understood that the trust and title companies which had accepted the provisions of the Hewitt bill would fall in class B, named above. Third. In pursuance of that agreement, the sinking fund commissioners caused to be issued warrants against the Bank of Kentucky, representing class A, the Louisville Banking Company, representing class B, and the Third National Bank, representing class C; and these banks respectively applied for writ of prohibition against the city court of Louisville proceeding with the hearing, that being the manner pointed out by the city charter for testing the validity of city ordinances. It was distinctly understood and agreed at that time—and this agreement was made for the best interest of all parties to it—that if any bank in any class should eventually fail to establish the existence and validity of the contract which it was claimed was made under the Hewitt bill, that all of that class should thereafter regularly and promptly submit to the existing laws, and pay their taxes. And it was also agreed that if any bank of any class should succeed in establishing a contract and the validity thereof under the Hewitt bill, that that should exempt all banks and companies failing within that class from the payment of taxes, except as provided in the Hewitt bill. Fourth. On the faith of this agreement, all of the banks and companies aforesaid paid into the sinking fund the amounts of taxes claimed against them, under the terms and conditions named in the minutes of the sinking fund commissioners, of February 13, 1894, an attested copy of which is hereto attached as part hereof; but at a later date, and in further reliance upon said agreement, all said banks and companies, except those actually involved in the test cases, paid the whole of the amount of taxes claimed as against them by the city of Louisville, without reservation until the question thus raised should be finally disposed of.

Humphrey & Davie.
Helm & Bruce.

For the Banks, Trust and Title Companies of the City of Louisville.

H. S. Barker,
City Attorney.

Approved:

C. H. Gibson,
Prest. Comrs. Sinking Fund City of Louisville.

A true copy. Attest:

Huston Quin,
Arthur Peter,
M. McLoughlin.

So much of the certified transcript of the judgment in the proceedings in prohibition as is of importance has been set forth in the report of the case of Bank of Kentucky v. Stone, 88 Fed. 383.

Helm & Bruce, for complainant.

Henry L. Stone, for defendant city of Louisville.

W. S. Taylor, Atty. Gen., for defendants Samuel H. Stone, etc., board of valuation and assessment of the state of Kentucky.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge (after stating the facts as above). In the case of Bank of Kentucky v. Stone, 88 Fed. 383, just decided, we have held that, by the judgment of the court of appeals and of the Jefferson circuit court in the prohibition suits, the city of Louisville was estopped to deny, as against the parties to that judgment, that they had an irrevocable contract of exemption from any greater burden of taxation than that imposed in the Hewitt act. The complainant in the case now before us was not a party to the record in either of the three prohibition suits, but it claims the benefit of the judgment therein as a privy to the parties. This privity is said to arise from an agreement between the city of Louisville, on the one part, and certain banks of Louisville, including the complainant, on the other, by which it was stipulated that the controversies between all the banks and the city should abide the event in test suits to be instituted by three banks selected to represent three classes.

Two questions are presented for our consideration: First. Was the contract described in the bill, and attached to it as an exhibit, the contract of the city of Louisville? Second. If so, did the contract bring the complainant into such relation to the prohibition judgment and the parties thereto that it may claim the benefit of the estoppel of that judgment?

First. The averment of the bill is that the contract set forth was signed by the president of the sinking fund, and by the attorney for the city, under the authority and direction of the mayor and board of sinking fund commissioners, and by the counsel who represented the banks in said litigations. The bill further recites that the agreement was made between the city of Louisville and its sinking fund commissioners and the banks and trust companies, including the complainant. Upon demurrer to the bill, these averments would doubtless be sufficient to show that the contract which was made was the contract of the city of Louisville. But the case is pending also upon the motion for a preliminary injunction; and upon that motion it is proper for us to consider the answer of the city of Louisville, which, by stipulation, was permitted to be filed without the withdrawal of the demurrer. The answer contains this averment:

"This defendant denies that said alleged agreement, an alleged copy of which or the substance of which is filed with complainant's bill, marked 'A,' was signed by the attorney for the city of Louisville, under the authority of the mayor, or that this defendant executed or delivered said alleged contract or agreement, or that the same was ever authorized, ratified, or approved by the general council and mayor of the city of Louisville; and said alleged agreement or contract set forth in said copy, marked 'A,' is not the act and deed of this defendant, and, in so far as the same purports to be an agreement or contract by or with this defendant, it was beyond the lawful power or authority of the city attorney, mayor, or any other officer of this defendant to execute or deliver for or on behalf of this defendant; and the same was made without express authority of law, and was and is null and void, and of no binding force or effect upon this defendant; nor does the same operate

to prevent or defeat the power and authority vested in this defendant by said act entitled 'An act for the government of cities of the first class,' approved July 1, 1893, to levy and collect its municipal taxes from the complainant and other banks and trust companies. This defendant states that said commissioners of the sinking fund of the city of Louisville was in 1894, and long prior thereto and ever since has been, a separate and distinct corporation from this defendant, organized and existing under the laws of the state of Kentucky, with power to sue and be sued, contract and be contracted with, and to do and perform all things necessary to execute the duties required and powers given by the act incorporating the same and the amendments thereto; but neither said commissioners of the sinking fund of the city of Louisville, nor the president nor the attorney thereof, nor all of them together, had any lawful power or authority thus to bind or obligate defendant by the terms, conditions, stipulations, or covenants, or either of them, contained in said alleged agreement or contract at the time, in the manner, or under the circumstances alleged in complainant's bill or otherwise."

Upon a motion for preliminary injunction, therefore, the issue is raised whether those who signed the contract on behalf of the city of Louisville were authorized to bind it thereto. We are of opinion that the city attorney was vested with ample authority to bind the city of Louisville to the contract mentioned in so far as it affected the complainant herein. By section 2909 of the Revised Statutes of Kentucky it is provided that:

"There shall be elected by the general council, immediately upon the assembling of the new board, a city attorney, whose duty it shall be to give legal advice to the mayor and members of the general council, and all other officers and boards of the city in the discharge of their official duties. If requested, he shall give his opinions in writing and they shall be preserved for reference. It shall also be his duty to prosecute and defend all suits for and against the city, and to attend to such other legal business as may be prescribed by the general council."

The foregoing section makes this officer the retained attorney of the city in every suit brought against it. The question at issue between the banks and the city of Louisville was whether the city could collect license taxes under one of its ordinances. The banks notified the city attorney and the commissioners of the sinking fund, whose duty it was to receive the money for the benefit of the city, that they intended to resist the collection of the tax by litigation. It was the duty of the city attorney, under the statute above set forth, to take charge of the litigation thus about to be brought. It was his duty, as the attorney of the city, to save, so far as he could without prejudice to the city's interests, costs which might be accumulated should suits to the number of 20 be brought and won by the banks against the city. It seems plain to us that it was within his general authority as attorney to make an arrangement with the intended litigants, by which the litigation to be brought should be reduced in volume to as few cases as possible by means of a stipulation that all the suits involving the same questions should abide the result in one suit to be brought. We think that such a stipulation was a mere step in the management of the litigation, and was entirely under the control of the attorney retained for the suits. It did not work to the prejudice of the city in the slightest. Had the suits actually been brought, a stipulation between the city attorney and the attorneys for the banks of this character would

have been as clearly part of the ordinary management of the suits as any other arrangement for expediting their trial. No material distinction can be suggested between the power of the city attorney to make an agreement of this character with respect to intended suits and suits actually filed. The control that an attorney has by virtue of his office over the suit in which he is employed is very wide in respect to those matters that relate to the progress of the suit and the mode of reaching a conclusion, and which do not deprive the client of a full opportunity to be heard by his attorney on the issues raised in the case. Such authority inheres in the relation between an attorney and client in respect to litigation, and the authorities fully sustain this conclusion.

In Railroad Co. v. Stephens, 36 Mo. 150, the plaintiff railroad company brought several suits against different stockholders in which the questions were precisely the same. The attorneys for the respective parties entered into a written agreement stating that, as the same facts arose in all the cases, they would abide by the judgment that should be rendered in one of them, and that a like judgment should be rendered in each of the several cases. It was contended in that case that the attorneys who made the agreement had no authority to make the agreement, and that it was void. The court sustained the agreement as within the authority of the attorney. It said:

"The arrangement in this case is not a 'compromise' according to the usual acceptation of that term, for that generally applies to releasing a part of the debt, taking land instead of money, or changing the nature and character of the thing to be recovered. It comes nearer within the general management of the case."

In Ohlquest v. Farwell, 71 Iowa, 231, 32 N. W. 277, a client was a party to two suits involving substantially the same question. It was held competent for his attorney to bind him by an agreement that only one of the cases should be tried, and that the judgment resulting from such trial should determine the kind of judgment to be entered in the other case. In delivering the opinion of the court, Judge Beck said:

"It is undoubtedly true that an attorney cannot consent to a judgment against his client, or waive any cause of action or defense in the case; neither can he settle or compromise it without special authority. But he is, by his general employment, authorized to do all acts necessary or incidental to the prosecution or defense which pertain to the remedy pursued. The choice of proceedings, the manner of trial, and the like, are all within the sphere of his general authority, and, as to these matters, his client is bound by his action. These rules are conceded by counsel in this case. It cannot be doubted that, under them, counsel for parties in several suits, involving the same issues, may, in the exercise of their general authority, consent to the consolidation of all for trial, or stipulate that the trial of one shall determine the others. This pertains to the remedy pursued,—to the manner of trial,— and is not an agreement for judgment or a compromise. The parties are not deprived of a trial, nor is judgment rendered by consent. The counsel simply assent to a trial in a particular manner; that one trial shall settle the same issues in several cases. This is just what was done by the counsel for Becker in this case. The form of agreement is that judgment in his case should follow a trial in another action. This is not an agreement for a judgment, but in effect an agreement for a manner of trial."

See, also, Eidam v. Finnegan, 48 Minn. 53, 50 N. W. 933; Gilmore v. Insurance Co., 67 Cal. 366, 7 Pac. 787.

In Thompson on Trials (volume 1, § 195) the author says:

"Where several cases are pending in court, depending upon the same facts or questions of law, it is competent for the attorneys, in virtue of their general retainers, to stipulate that only one shall be tried, and that the others shall abide the result of that one."

We think, therefore, that, in so far as the issues arising between the banks not actually engaged in the litigation and the city of Louisville were the same as in the three suits which were brought as test cases, the contract made by the city attorney was binding upon the city.

The next question is whether the contract made enables the complainant bank to claim the benefit of the estoppel of the judgments thereafter rendered. We think it does. In Patton v. Caldwell, reported in 1 Dall. 419, the action was on a policy of insurance. Counsel for plaintiff offered to read in evidence a special verdict that had been given in another action against a different underwriter. This was objected to on the ground that the verdict was given between other parties, and therefore not admissible, upon which an agreement of all the underwriters to be bound by one verdict was proven. McKean, C. J., said:

"The defendant had no opportunity of cross-examining upon the former trial; and the answer is that he, with the rest of the underwriters, had agreed to be bound by one verdict, which is certainly the only ground for offering the evidence proposed by the plaintiff's counsel. Whether this agreement was made in person or by a broker mutually employed, it is equally binding on the parties; and, under the agreement, all the underwriters were fully entitled to interfere upon the former trial, and to cross examine the witnesses then produced. Although, therefore, we should not have allowed the special verdict to be read, without full proof of the agreement, yet, on receiving that satisfaction, we think it would be unfair to suppress it; and, for the future, we desire that all such agreements may be entered on the records of the court."

The court then held that the verdict thus offered was not conclusive. As the latter proposition, however, is in conflict with the rule laid down by the supreme court of the United States in a recent case of Southern Pac. R. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, that part of the decision cannot be regarded as authority here.

In Brown v. Sprague, 5 Denio, 545, several ejectments were pending between one claiming title and persons having only the naked possession of the lands. An agreement was made between all the parties that the suits should be stayed and await the event of a suit between other parties in which the same questions arose. It was held that a judgment in that suit would operate as an estoppel between the parties to the agreement.

Mr. Freeman, in his work on Judgments, says (section 174):

"Neither the benefit of judgments, on the one side, nor the obligations, on the other, are limited exclusively to parties and their privies. Or, in other words, there is a numerous and important class of persons who, being neither parties upon the record, nor acquirers of interests from those parties after the commencement of the suit, are, nevertheless, bound by the judgment. Prominent among these are persons on whose behalf and under whose direc-

tion the suit is prosecuted or defended in the name of some other person. * * * The fact that an action is prosecuted in the names of nominal parties cannot divest the case of its real character, but the issues made by the real parties, and the actual interests involved, must determine what persons are precluded from again agitating the question, and who are estopped by the previous decision. Whenever one has an interest in the prosecution or defense of an action, and he, in the advancement or protection of such interest, openly takes substantial control of such prosecution or defense, the judgment, when recovered therein, is conclusive for and against him to the same extent as if he were the nominal as well as the real party to the action. * * * Where one seeks the benefit of an estoppel by judgment on the ground that he was the real party in interest in an action, he must show that he conducted the action or defense openly, to the knowledge of the adverse party, and for the protection of his own interests."

These principles are sustained by the cases cited by the learned author. See Cole v. Favorite, 69 Ill. 457; Wood v. Ensel, 63 Mo. 193; Tate's Ex'rs v. Hunter, 3 Strob. Eq. 136–140; Palmer v. Hayes, 112 Ind. 289, 13 N. E. 882; Gill v. U. S., 7 Ct. Cl. 522, 526. See, also, Herm. Estop. § 139.

In 1 Greenl. Ev. § 523, the principle is stated as follows:

"But, to give full effect to the principle by which parties are held bound by a judgment, all persons who are represented by the parties, and claim under them or in privity with them, are equally concluded by the same proceedings. We have already seen that the term 'privity' denotes mutual or successive relationship to the same rights of property. The ground, therefore, upon which persons standing in this relation to the litigating party are bound by the proceedings to which he was a party, is that they are identified with them in interest; and, wherever this identity is found to exist, all are alike concluded. Hence all privies, whether in estate, in blood, or in law, are estopped from litigating that which is conclusive upon them with whom they are in privity. And if one covenants for the results or consequences of a suit between others, as if he covenants that a certain mortgage assigned by him shall produce a specified sum, he thereby connects himself in privity with the proceedings, and the record of the judgment in that suit will be conclusive evidence against him."

In the case of Rapelye v. Prince, 4 Hill, 119, Mr. Justice Bronson, speaking for the supreme court of New York, said:

"When one covenants for the results or consequences of a suit between other parties, the decree or judgment in such suit is evidence against him, although he was not a party."

In the present case there can be no doubt from an examination of the contract and the averments of the bill that the three suits which were conducted were openly conducted in the interest of all the parties to the agreement with the knowledge and by the consent of the city of Louisville, and that the counsel who appeared for the parties to the records were at the same time discharging their duties as counsel for the other banks who had made the agreement. If any one can be bound by a judgment to which he is not a party, it would seem that the banks here must have been so bound. Had the result gone the other way, and a judgment been rendered in favor of the city of Louisville in the cases referred to, it cannot admit of doubt that all the banks would have been bound by the decision. As part of the consideration for the settlement of the litigation in the manner fixed by the agreement, the banks paid to the sinking fund commissioners for the city of Louisville the substantial sum of

$150,000. Had the agreement not been entered into, it is certain that the complainant would have obtained formal judgment in a prohibition suit, and would now have been in the same position as the Louisville Banking Company. Relying on the binding character of the agreement, however, judgment was not taken in the name of complainant. Equity and justice require that effect should be given to an agreement upon the faith of which $150,000 was immediately paid to the city, and a formal judgment was not taken. It is just that, inasmuch as the banks would have been bound by a diverse judgment, they shall have the benefit of a judgment which was rendered in favor of their colleagues selected to represent them in the suit. This conclusion necessarily leads to the result that the demurrer to the bill must be overruled, and the motion for a preliminary injunction allowed.